OPINION.
On June 14, 1998, defendant-appellant Melissa Vanover killed Michael Nieman by shooting him three times with a .357 Magnum revolver as he lay asleep in his bed. After killing Nieman, Vanover and several of her friends took his property, including hundreds of thousands of dollars worth of currency, jewelry, and marijuana, and thirteen firearms. Vanover challenges her convictions, following a trial to a jury, for aggravated murder, in violation of R.C. 2903.01(A), and theft, in violation of R.C.2913.02(A)(1), both with accompanying firearm specifications. The jury also returned verdicts of not guilty on death-penalty specifications, on a felony-murder aggravated-murder count, and on an aggravated-robbery count. In eleven assignments of error, Vanover alleges that her convictions were the cumulative result of prosecutorial misconduct, including discovery violations, and the erroneous admission or exclusion of testimony to bolster her claim that she acted in self defense, and that the convictions were against the manifest weight of the evidence. The assignments of error are not well taken.
 Facts
In November 1997, Nieman met Vanover at a Northern Kentucky bar where she worked as an exotic dancer. Nieman described himself as a self-employed jewelry salesman. In addition to his wholesale dealings in jewelry, the record reveals that Nieman dealt in large-quantity sales of marijuana.
Nieman and Vanover established a romantic relationship. Vanover then provided the sole support for her four children. Nieman lavished gifts upon Vanover. He took her to many area nightspots. He paid many of her bills, gave her a weekly allowance of nearly $500, took her on his business trips to California and Arizona, and provided money to gamble at southeast Indiana casinos. But her relationship with Nieman had a darker side. Nieman lived the violent life of a major drug dealer. He kept a stockpile of loaded weapons in each room of his one-bedroom house. He acted violently toward Vanover, discharging firearms into the walls near where Vanover stood, beating her, and even attacking her with a stun gun. Nonetheless, Vanover related to her friends that her relationship with Nieman put her in the best situation she had ever experienced.
In March 1998, while still involved with Nieman, Vanover began a relationship with the Green family, her next-door neighbors. The Greens' daughter, Melanie, played with Vanover's children. Her mother, Brenda Green, babysat the children. Brenda's son, John Green, Jr., and his girlfriend, Angela Armacost, "partied" with Vanover, often smoking marijuana. Vanover commenced a sexual relationship with John's younger brother Kevin, calling him her boyfriend.
Vanover told John Green, Jr., and Armacost about the large amounts of cash and jewelry in Nieman's house. She confided in them that she intended to rob Nieman. On the night of the murder, Melanie Green heard Vanover "say that she was going to do something with Mike in the room when he turned around taking his clothes off." Melanie related this information to her mother, stating, "Missy's going to do her plan."
On the evening of June 14, 1998, Vanover, Nieman and Melanie Green attended a family birthday party. Both Vanover and Nieman consumed alcohol and took Valium. Vanover was upset because she had surrendered her children to the custody of her husband, Kenneth Brumfield. Vanover and Nieman argued over the children. Nieman despised them because their father was African-American. Eventually the two returned to Nieman's house.
Vanover lingered in the car to calm herself. When she entered the house, Nieman was already in bed and watching television. Vanover claimed that Nieman then struck her. Lying on his right side in the bed, with his back to Vanover, Nieman reached for what Vanover deemed to be a weapon. She then claimed to have retrieved a revolver from beneath the mattress and shot Nieman in self-defense. She claimed to be on the floor beside the bed when she shot. Evidence at trial indicated that the fatal shots first struck Nieman in the back and were fired from a distance of less than six inches.
Vanover called Kevin Green and told him she had killed Nieman. She told Brenda Green, "I can't believe I did this. He loved me, he loved me." John Green, Sr., John Green, Jr., Kevin Green, and Armacost arrived at the Nieman house. Vanover explained that she could not believe she had shot Nieman. With the assistance of the group, Vanover gathered cash, guns, marijuana, and jewelry. John Green, Sr., removed the firearms, ultimately dumping them into a rural pond. Kevin and John, Jr., stuffed a black bag with money and jewelry and placed it in Armacost's car. Vanover seemed "happy" to John Sr. The group ultimately delivered Kevin Green and Vanover to a local motel. There, Kevin Green recounted, he and Vanover had sexual relations on a pile of the seized cash.
The next day, Vanover reenacted the killing for Kevin, John, Jr., and Armacost. She admitted pretending to crawl into bed and killing Nieman while covering herself with the sheet. The group moved to another motel and then left in Armacost's car in search of food. Local police officers observed Armacost's vehicle change lanes without signaling and stopped the vehicle. Detecting the smell of marijuana and finding an open arrest warrant on John Green, Jr., the officers obtained consent from Armacost to search the vehicle. The officers discovered marijuana "roaches," large amounts of cash, and jewelry with price tags attached. Suspecting they had uncovered a jewelry theft, the officers arrested all four occupants. Vanover yelled to Kevin Green, "Don't say a fucking thing, keep your mouth shut, they don't know nothing, just keep your mouth shut, they don't know shit."
The Greens and Armacost disregarded Vanover's entreaty and quickly disclosed Nieman's murder. John Green, Sr., John Green, Jr., and Armacost each received favorable plea bargains and testified as witnesses for the state. During a lengthy trial, forty witnesses gave testimony. Nearly one hundred exhibits were admitted into evidence. Vanover called over a dozen witnesses and gave testimony, under oath, in her own defense.
 State-of-Mind Evidence
In two interrelated assignments of error, Vanover claims the trial court erred by excluding her own testimony concerning Nieman's violent drug-dealing lifestyle and the testimony of a California highway patrolman who had observed Nieman and Vanover at a 1998 traffic stop. She contends that exclusion of the testimony "precluded" her from adducing evidence that she acted subserviently in Nieman's presence and that she feared him, an element of her claim of self-defense, thus denying her a fair trial.
To prove the affirmative defense of self-defense, Vanover was required to show the following by a preponderance of the evidence: (1) she was not at fault in creating the situation giving rise to the argument or fight; (2) she had a bona fide belief that she was in imminent danger of death or great bodily harm and that the only way to escape was to use force; and (3) she did not violate a duty to retreat. See State v. Thomas (1997), 77 Ohio St.3d 323, 326,673 N.E.2d 1339, 1342.
The "second element of self-defense is a combined subjective and objective test." Id. at 330, 673 N.E.2d at 1345. As theThomas court noted,
 The jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she reasonably believed she was in imminent danger. * * * Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger.
Id. Therefore, Vanover claims, the trial court's exclusion of evidence "deprived the jury of Vanover's knowledge, her state of mind, and her fear of Nieman."
A trial court is given broad discretion in the admission and exclusion of evidence. The court, in the exercise of that discretion, may exclude relevant evidence if it determines that the evidence is needlessly cumulative. See Evid.R. 403(B). Because the trial court has broad discretion in admitting or excluding evidence, the Ohio Supreme Court has admonished appellate courts not to interfere unless the trial court has clearly abused its discretion. See State v. Apanovitch (1987),33 Ohio St.3d 19, 25, 514 N.E.2d 394, 401.
Vanover proffered the testimony of California Highway Patrol Officer Albert D. Contreras. Contreras had arrested Nieman for driving while intoxicated in California in February 1998. Vanover was in the car. At a deposition conducted in California, Contreras described Nieman as overbearing, demeaning, and very arrogant, and noted, "Whatever [Nieman] would tell her to do, she would do. You could tell she was scared." Upon objection, the trial court excluded Contreras's testimony.
Vanover has failed to demonstrate how she was prejudiced by this exclusion. The probative value of Contreras's testimony merely duplicated other evidence, more connected in time and place to Nieman's death, indicating that Vanover feared Nieman. Indeed, Vanover testified at length about the traffic stop. She recounted that she was afraid because Nieman "didn't tell me at the time why we were being pulled over." She also noted that a highway patrol officer had summoned a taxicab for her and walked her to the cab. The trial court's exclusion of the proffered testimony as cumulative was not unreasonable, arbitrary, or unconscionable, and, therefore, was not an abuse of discretion. See State v.Richardson (1994), 94 Ohio App.3d 501, 510-511, 641 N.E.2d 216,222, overruled on other grounds in Dayton v. Erickson (1996),76 Ohio St.3d 3, 665 N.E.2d 1091; see, also, State v. Lundy (1987),41 Ohio App.3d 163, 168-170, 535 N.E.2d 664, 671-672.
Vanover next claims that the trial court's exclusion or limiting of five of her statements was also error. In none of the cited instances did the trial court abuse its discretion by unreasonably limiting Vanover's state-of-mind testimony. Indeed, in most of the claimed errors, the trial court ultimately permitted the statements into evidence, thus negating any claim of prejudice that may have arisen.
First, the trial court did not abuse its discretion in limiting testimony about the victim's boasts about his Arizona property. The court overruled the prosecution's objection and permitted Vanover to testify that "[Nieman] made the statement that if he wanted to kill someone he'd bury them there and no one would know or do the job there and no one would know." Second, the trial court properly excluded Vanover's testimony that she "was in fear" of a third person when Nieman ordered her to attend to two suitcases full of money in their hotel room until they were retrieved by that third person. Vanover's defense related to her fear of Nieman, not of other unnamed individuals. Third, the court did not abuse its discretion in excluding testimony that, while in Arizona, Nieman made Vanover carry a gun for protection. Vanover later was permitted to testify "[t]hat I was told to wear a gun which I had never did before. Never even really been around a gun before, which that scared me * * *." Vanover's sister Danita Baldrick corroborated her concerns over being instructed by Nieman to carry a firearm for protection. Fourth, the statement that Nieman did not fear the police because he controlled them was properly excluded because it was the proffered belief of Baldrick, not Vanover. Baldrick's beliefs were not an element of Vanover's affirmative defense. Baldrick was permitted to testify that she did not call the police because "Michael Nieman told me that he knew cops, judges, lawyers, anybody, and I believed him." Finally, the trial court did not abuse its discretion in limiting Vanover's testimony that Nieman had claimed to have killed before and to have served time in federal prison. The trial court did permit her, without objection, to state that Nieman "had people killed before, that it was no big deal to him. That he said one time that he would always look the person in the eyes before he killed them." The trial court's exclusion of testimony as to whether Nieman actually served jail time, which the state disputed at sidebar, was not unreasonable, as it served to avoid a mini-trial on a tangential issue during the course of a lengthy trial. See Evid.R. 403(B).
Moreover, Vanover was not "precluded" from presenting evidence relevant to her belief of imminent death. During Vanover's extensive trial testimony, she repeatedly stated that she was afraid of Nieman. She recounted that Nieman acted violently in her presence, kept loaded weapons in every room of the house, yelled at her, called her names, broke furniture on her, discharged firearms into the walls near where she stood, shocked her with a stun gun, pulled her hair, kicked her radio, and struck her. Vanover's claims of Nieman's vicious demeanor, drug and firearm possession, and gambling were largely corroborated by the testimony of other witnesses and by the physical evidence admitted at trial.
As the trial court did not abuse its discretion in excluding some cumulative or confusing relevant testimony in a lengthy trial in which Vanover had ample opportunity to present evidence in favor of her affirmative defense, the fourth and sixth assignments of error are overruled.
 Mispresentations to the Jury
In three interrelated assignments of error, Vanover claims that the trial court erred by permitting the prosecution to knowingly misrepresent to the jury that Nieman was a jeweler when it knew that he was otherwise a violent and dangerous drug dealer, and by preventing Vanover from cross-examining Nieman's daughter as to her father's drug dealings.
In her first assignment of error, she asserts that references by the prosecutor during the voir dire of the jury, during opening statement, and during the direct examination of Nieman's daughter concerning his employment as a self-employed entrepreneur engaged in the wholesale jewelry business were in essence lies made to the jury.
While Vanover does not dispute that Nieman did sell jewelry, she notes that the state filed a pretrial motion in limine to limit the defense from introducing evidence of Nieman's criminal background. During an in camera hearing on the motion, search warrants were unsealed and testimony was heard in which law enforcement agents stated Nieman was a high-level drug dealer engaged in large-scale marijuana sales in Hamilton County. In a separate ongoing forfeiture action, the state had seized over $1.5 million of Nieman's assets, including the evidence seized in the traffic stop, which it claimed were the proceeds of a major drug-smuggling operation.
Vanover argues that despite this knowledge, the prosecution persisted in calling Nieman a jeweler. Vanover asserts that the prosecutors' knowing misrepresentations to the jury were misconduct that so tainted the trial as to require a reversal of her convictions. We note that the three instances of misrepresentations alleged in the first assignment of error were not objected to at the time they were made to the jury. Therefore, those statements are analyzed under the plain-error rule. A claim of error in a criminal case can not be predicated upon the improper remarks of counsel during argument, which were not objected to, unless such remarks served to deny the defendant a fair trial. See State v. Fears (1999), 86 Ohio St.3d 329, 332,715 N.E.2d 136, 143. Similarly, the admission of testimony from Nieman's daughter, made without objection, cannot be the basis of reversal absent plain error. See Crim.R. 52(B) and Evid.R. 103(A).
Despite all the foregoing, Vanover does not suggest how she was prejudiced by the state's references to Nieman as an entrepreneur and a jeweler. Vanover's experienced trial counsel noted in closing argument, "I don't care what Michael Nieman did for a living * * *. That to me has nothing to do with anything in this case * * *. You know, he could have been a violent doctor, he could have been a violent lawyer, he could have been a violent anybody. That doesn't matter." The trial court had wide discretion to control the admission and exclusion of extrinsic evidence such as Nieman's occupation. See, e.g., State v. Heath
(June 25, 1997), Hamilton App. No. C-950676, unreported. Nieman's occupation was not per se relevant to any disputed issue at the trial, as the victim's character is not an element of the affirmative defense of self-defense. See State v. Carlson (1986),31 Ohio App.3d 72, 74, 508 N.E.2d 999, 1001.
Vanover's knowledge of Nieman's violent traits and acts was, however, an element of her affirmative defense. Nothing in the actions of the trial court or the prosecution prevented Vanover from offering ample evidence that Nieman acted violently, kept loaded weapons in every room of the house, possessed large amounts of marijuana, and transacted his business in unusually large amounts of cash. The jury, acting as the trier of fact, was not prevented from hearing evidence from which it could well have concluded that Nieman was more than a self-employed entrepreneur earnestly engaged in the sale of jewelry. As Vanover's substantial rights were not affected by these statements and representations by the prosecution, the first assignment of error is overruled. See Crim.R. 52(B) and Evid.R. 103(D).
The second assignment of error, in which Vanover claims that the prosecution was judicially estopped from characterizing Nieman as a jeweler because it had commenced a separate civil-forfeiture proceeding in which it had described him as a major drug dealer. See, e.g., Thompson v. Calderon (C.A.9, 1996), 120 F.3d 1045,1058, reversed on other grounds (1998), 523 U.S. 538,118 S.Ct. 1489 (a prosecutor cannot, in order to convict two defendants at separate criminal trials, offer inconsistent theories and facts regarding the same crime).
As the state points out, Vanover did not raise this issue before the trial court. An appellate court need not consider an error that the appealing party could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. SeeState v. Williams (1977), 51 Ohio St.2d 112, 364 N.E.2d 1364, paragraph one of the syllabus; see, also, App.R. 12(A)(1)(b). The issue is waived, and the assignment of error is overruled.
In her seventh assignment of error, Vanover claims that the trial court erred by limiting the cross-examination of Dominique Nieman about matters that would have demonstrated her bias and prejudice. See Evid.R. 616(A). Vanover claims that Nieman's daughter had a pecuniary interest in characterizing her father as a jeweler, and not as a drug dealer: she would inherit his assets unless they were seized pursuant to the pending drug-forfeiture action.
The scope of cross-examination and the admissibility of evidence during cross-examination are matters that rest in the sound discretion of the trial court. See Calderon v. Sharkey
(1982), 70 Ohio St.2d 218, 222, 436 N.E.2d 1008, 1012. The trial court has broad discretion relative to admission or exclusion of evidence going to the impeachment or credibility of a witness, in part because such evidence is collateral to the principal issues at trial and can lead to inquiry into unrelated matters. See Evid.R. 403(B); see, also, State v. Heath.
Here, in light of the length of the trial and the inability of Vanover to demonstrate prejudice flowing from the denial of cross-examination where she otherwise adduced ample evidence that Nieman may have been a drug dealer as well as a jeweler, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably in limiting the cross-examination of Dominique Nieman. The seventh assignment of error is overruled.
 Discovery Violation
In her third assignment of error, Vanover contends that the prosecutor's willful failure to disclose a statement made by Vanover in which she denied killing Nieman constituted reversible error. The statement was made to Sharon Todd, a children-services investigator, while Vanover was incarcerated in the Hamilton County Justice Center. According to Vanover, the denial, which was first disclosed before the jury, served to impermissibly impeach her credibility.
The state's willful failure to provide discovery can result in reversible error if there is a showing that foreknowledge of the statement would have benefited the accused in the preparation of her defense, or that the accused was prejudiced by the use of the statement. See State v. Parson (1983), 6 Ohio St.3d 442,453 N.E.2d 689, syllabus.
Here, pursuant to Crim.R. 16, Vanover properly requested disclosure of all statements that she had made. At trial, the state presented the testimony of Todd, who had visited Vanover while she was incarcerated in the justice center. The state called Todd as a rebuttal witness to contest Vanover's stated reasons for surrendering her children. During examination by the prosecutor, Todd stated, "She was surprised to see me. She was crying. She explained to me that she did not kill him. She stated to me —." Defense counsel objected, noting, out of the presence of the jury, "There has never been any disclosure of any statements made while in custody of this defendant to this agent of the State of Ohio." Vanover moved for a mistrial, and a lengthy sidebar discussion ensued.
Responding to a question posed by the trial court, the prosecutor admitted, "No. I knew about it, I did." The court then inquired, "How long have you known about it?"
The prosecutor admitted, "For a couple of months, I'm not going to say I didn't. I did, but —."
Despite the state's admitted willful failure to disclose her statement, Vanover cannot demonstrate prejudice flowing from this conduct. She asked for and received a curative instruction from the trial court to the jury that it was to disregard Todd's response, the state withdrew the question, and it asked no more questions of Todd. A jury is presumed to follow the instructions, including curative instructions to disregard testimony, given it by a trial judge. See State v. Garner (1995), 74 Ohio St.3d 49,59, 656 N.E.2d 623, 624. Moreover, Vanover withdrew her motion for a mistrial following the sidebar. Under these circumstances, only a finding of plain error would require sustaining the assignment of error. See Crim.R. 52(B).
While the prosecutor's failure to disclose the statement for a period of months, especially after it became clear that Vanover was pursuing the affirmative defense of self-defense, in which she admitted killing Nieman, was improper and was error, it is manifest that Vanover's rights were not substantially affected. The state presented substantial evidence of guilt at trial. The brief disclosure to the jury came from a witness testifying to rebut Vanover's explanation of why her children did not live with her. The decision to withdraw her motion for a mistrial, reached by her two experienced and skilled trial attorneys, coupled with the effect of the court's curative instruction, served to minimize the prejudicial impact. The third assignment of error is, therefore, overruled.
 Drug-Treatment Testimony
In her eighth assignment of error, Vanover claims that the trial court erred in permitting the jury to hear testimony concerning her previous treatment for drug addiction. Over her objection, the state, during cross-examination of her husband, Kenneth Brumfield, a defense witness, elicited that Vanover and Brumfield had met at a drug-treatment facility. The trial court did not abuse its discretion by admitting this testimony, as Brumfield had earlier testified about how they had met. Vanover herself had testified about their meeting, and the state was properly permitted to elicit evidence that Vanover began a relationship with Brumfield despite her knowledge of his drug problems. See Evid.R. 403.
 Closing Argument
Vanover next asserts that the trial court erred by allowing the state to engage in misconduct during closing argument by making inappropriate comments about Vanover's profession for the sole purpose of disparaging her in the eyes of the jury.
In closing argument, the female prosecutor reminded the jury that Vanover was "a dancer across the river," and that "when you judge her testimony remember she's a performer." The prosecutor also told the jury, "[W]hen I stand in front of you and do this, you know I'm practiced, I've done this a lot, I still get nervous, it still makes me upset." She continued,
 But, you know, I don't take my clothes off. That takes a whole kind of special person to perform like that and to be able to do that to an audience. To be able to excite an audience and turn an audience on and to, you know, be able to do these things. She can communicate with her body to a bunch of people. You know, she's asking you to judge her.
Just be careful is all I'm saying.
Vanover asserts that these were improper comments on her credibility as a witness and personally demeaned her for being a dancer in a nightclub.
We note that these comments were not objected to by Vanover's experienced trial team. Where the defendant fails to lodge a contemporaneous objection to instances of alleged prosecutorial misconduct, this failure waives all but plain error. See Crim.R. 52(B); see, also, State v. Fears (1999), 86 Ohio St.3d 329, 332,715 N.E.2d 136, 143.
The linchpin of prosecutorial-misconduct analysis is "whether the conduct complained of deprived the defendant of a fair trial."State v. Fears, 86 Ohio St.3d at 332, 715 N.E.2d at 143, citingState v. Apanovitch, 33 Ohio St.3d at 24, 514 N.E.2d at 400. Where, as here, the defendant portrays herself as a single mother working at a tough job to support her children and calls a fellow dancer as a witness, and where there is ample evidence of guilt, we cannot say that the prosecutor's comments affected a substantial right of the defendant and denied her a fair trial. The fifth assignment error is overruled.
 The Motion to Suppress
In her ninth assignment of error, Vanover contests the trial court's overruling of her motion to suppress the evidence gained from the traffic stop of Angela Armacost's vehicle on the night of June 16, 1998.
The test for probable cause to arrest without a warrant is whether the facts and circumstances within an officer's knowledge were sufficient to warrant a prudent individual in believing that the accused had committed or was committing an offense. See Statev. Heston (1972), 29 Ohio St.2d 152, 155-156, 280 N.E.2d 376, 379, citing Beck v. Ohio (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225; see, also, State v. Deters (1998), 128 Ohio App.3d 329,714 N.E.2d 972.
Review of the trial court's findings of fact and legal conclusions entails a two-step inquiry. See Ornelas v. UnitedStates (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 1663. The credibility of the Blue Ash police officers who testified at the hearing on the motion was for the trial court, sitting as the trier of fact, to determine. See State v. DePew (1988), 38 Ohio St.3d 275,277, 528 N.E.2d 542, 547. The trial court found, and the record supports the conclusion, that Armacost's vehicle abruptly changed lanes without signaling, thus prompting a valid traffic stop; that the officers detected the smell of marijuana emanating form the vehicle; that after ascertaining the identities of the passengers, the officers found an open warrant for the arrest of Johnny Green, Jr.; that Armacost, the operator of the vehicle, consented to a search of the car; that the officers located approximately $345,000 in currency, two pounds of marijuana, and large amounts of jewelry with price tags still attached in the trunk of the vehicle; and that the officers located several thousand dollars of currency in Vanover's purse, money she claimed she was using to purchase a car.
The facts and circumstances demonstrated in the record were sufficient to establish a belief in a reasonable officer that there was probable cause to stop the vehicle and then to arrest the occupants for theft of the jewels. See Ornelas v. UnitedStates. Therefore, the trial court did not err in overruling the motion to suppress, and the evidence and the statements that flowed from the arrests were properly admitted in the state's case-in-chief. The ninth assignment of error is overruled.
 Manifest Weight of the Evidence
In her tenth assignment of error, Vanover challenges the manifest weight of the evidence adduced to support her conviction for aggravated murder. Our review of the record fails to persuade us that the jury, sitting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Tibbs v.Florida (1982), 457 U.S. 31, 102 S.Ct. 2211; see, also, State v.Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. The jury was entitled to reject Vanover's claim that she had acted in self-defense and to conclude instead that she had purposely, with prior calculation and design, caused the death of Michael Nieman. The state presented ample evidence that Vanover planned in advance to rob Nieman and prepared to kill him with a .357 Magnum revolver. While Vanover presented evidence that she feared that Nieman would harm her and highlighted deficiencies in the prosecution's representation of Nieman as an entrepreneur, the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine. SeeState v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The tenth assignment of error is overruled, as our review of the entire record fails to persuade us that the trier of fact lost its way and created a manifest miscarriage of justice.
 Cumulative Error
In her final assignment of error, Vanover contends that the cumulative effect of the errors committed at trial deprived her of a fair trial, thus requiring the reversal of the convictions. Because none of the ten previous assignments have been sustained, there is no cumulative error to recognize. See State v. Davis
(1991), 62 Ohio St.3d 326, 581 N.E.2d 1362. The eleventh assignment of error is without merit.
Therefore, the judgment of the trial court is affirmed.
Judgment affirmed.
 PAINTER and WINKLER, JJ., concur.