[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 323.]

THE STATE OF OHIO, APPELLEE, *v*. THOMAS, APPELLANT.

[Cite as *State v. Thomas*, 1997-Ohio-269.]

*Criminal law—Murder—No duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home.*

———————————

There is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home.

———————————

(Nos. 95-1837 and 95-1938—Submitted June 4, 1996—Decided January 22, 1997.)

APPEAL from and CERTIFIED by the Court of Appeals for Athens County, No. 94 CA 1608.

———————————

{¶ 1} On September 15, 1993, Teresa Thomas, defendant-appellant, shot and killed Jerry Flowers, her live-in boyfriend. At her trial for murder, Thomas admitted to shooting Flowers, but asserted that she had shot Flowers in self-defense, basing the defense on the battered woman syndrome.

{¶ 2} Thomas and Flowers had known each other for most of their lives when they first began dating two years prior to the shooting. By the end of 1991, Flowers and Thomas began living together. In July 1993, they moved into a new mobile home.

{¶ 3} Thomas testified that the relationship was marked by violence and intimidation, including incidents of Flowers pushing her against a wall, injuring her shoulder enough for her to go to the emergency room, and punching her in the abdomen, rupturing an ovarian cyst. She stated that he would purposely soil his

clothes and then order her to clean them. He controlled the couple's money, and eventually ordered Thomas to quit her jobs. He did virtually all of the grocery shopping. On the two occasions when he permitted her to do the shopping, he required her to present to him the receipt and the exact change. At times, he would deny her food for three to four days. He also blamed his sexual difficulties on her.

{¶ 4} Approximately three weeks before the shooting, Flowers's behavior became more egregious. In the middle of the night, almost every night, he would wake Thomas up by holding his hands over her mouth and nose so that she could not breathe. Flowers had trouble sleeping and on several occasions accused Thomas of changing the time on the clocks. He often told her how easy it would be to kill her by snapping her neck, shooting her with a gun, or suffocating her, and then hiding her body in a cave. This discussion occurred almost every time they awoke.

{¶ 5} Three days prior to the shooting, Thomas fixed a plate of food, which Flowers refused to eat or to let her clear from the table. He put cigarette butts in the food and played with it. Thomas testified that if she had cleaned up the food he would have beaten her.

{¶ 6} Thomas testified that Flowers forced her into having sexual relations against her wishes, that he blamed her for his periodic impotency, and that two days prior to the shooting, he anally raped her.

{¶ 7} The night before the shooting, Flowers yelled at Thomas and threw flour, sugar, cider, and bread on the floor. They argued all night, and before Flowers went to work on Wednesday morning, he ordered Thomas to clean up the mess, told her he would kill her if she did not do it by the time he came home, and struck her on the arm. After he left, Thomas went to see her mother and they returned to Thomas's and Flowers's mobile home. Thomas testified that her mother seemed entirely uninterested in Thomas's situation. When Thomas's mother left, Thomas went to see Flowers's father, and then she returned to her mobile home.

2

Thomas started to clean up the kitchen but stopped to eat a sandwich, sitting at the kitchen table.

{¶ 8} At 12:45 p.m., Flowers came home from work early and, according to Thomas, he sneaked to the mobile home so that she wouldn't see him. She did see him, however, and when she did not get up to meet him at the door, he started yelling. When Flowers moved to the kitchen door, Thomas ran to the bathroom. Thomas testified that she could not get out of the tiny bathroom window and that she was afraid that Flowers was going to kill her. She then ran to Flowers's closet and grabbed his gun out of the holster. She ran back to the kitchen and Flowers continued to yell at her and threaten to kill her. According to Thomas, she fired two warning shots and when Flowers continued to threaten her, she shot him in the arm twice. Each of these two bullets also entered his torso. Flowers fell and then started to get up again, continuing to threaten Thomas. Thomas shot Flowers two more times, while he was bent over; the shots entered Flowers in the back.

{¶ 9} Dr. Larry Tate, a pathologist with the Franklin County Coroner's Office, testified that Flowers had two bullet wounds in the arm, one in the chest, one in the abdomen, and two in the back.

{¶ 10} In support of her self-defense argument, Thomas presented the testimony of Dr. Jill Bley, a clinical psychologist who has extensive experience in treating and diagnosing women with the battered woman syndrome. Dr. Bley explained the classic symptoms and signs of the battered woman syndrome and then described her examination of Thomas. Dr. Bley stated that she diagnosed Thomas as suffering from the battered woman syndrome and that Thomas reasonably believed that Thomas was in danger of imminent death or serious bodily harm at the time of the shooting.

{¶ 11} On September 22, 1993, the grand jury indicted Thomas for aggravated murder, a violation of R.C. 2903.01(A), with a firearm specification, a violation of R.C. 2941.141. From December 7 through 17, 1993, the case was tried

to a jury. At the close of the state's case in chief, Thomas moved for an acquittal. The court denied the motion in part, but finding that the element of "prior calculation and design" had not been proved, dismissed the charge of aggravated murder, allowing the case to proceed on the lesser included charge of murder with a firearm specification, in violation of R.C. 2903.02(A) and 2941.141. On December 20, 1993, the jury found Thomas guilty of murder with a firearm specification.

{¶ 12} Upon appeal, Thomas argued that the trial court erred by not instructing the jury that she had no duty to retreat from a cohabitant and that the court's instructions to the jury on the battered woman syndrome were incomplete. The court of appeals affirmed the conviction and certified a conflict with the decision of the Court of Appeals for the Eighth District in *State v. Reed* (June 9, 1994), Cuyahoga App. No. 65109, unreported, 1994 WL 258636, regarding the issue of whether a cohabitant has a duty to retreat. The cause is now before this court upon our determination that a conflict exists in case No. 95-1938.

{¶ 13} The cause is also now before this court pursuant to the allowance of a discretionary appeal in case No. 95-1837.

_____

*William R. Biddlestone*, Athens County Prosecuting Attorney, and *Birgit Pederson*, Assistant Prosecuting Attorney, for appellee.

*Carol A. Wright; Jay Wamsley* and *J. Michael Westfall*, Assistant Public Defenders, for appellant.

*Sowash & Carson* and *Herman A. Carson*, urging reversal for *amici curiae*, Ohio Association of Criminal Defense Lawyers, ACTION OHIO, Pace University Battered Women's Justice Center, Edna Brooks Foundation, Inc., Ohio Domestic Violence Network, and National Clearinghouse for the Defense of Battered Women.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 14} This case presents issues involving the duty to retreat between cohabitants and jury instructions in trials in which the criminal defendant asserts the battered woman syndrome as support for the defense of self-defense.

I

{¶ 15} We first consider whether there is a duty to retreat when one is attacked in one's own home by a cohabitant with an equal right to be in the home.

{¶ 16} In Ohio, the affirmative defense of self-defense has three elements: (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Williford* (1990), 49 Ohio St.3d 247, 249, 551 N.E.2d 1279, 1281, citing *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus.

{¶ 17} Because of the third element, in most cases, "a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation." *Williford*, 49 Ohio St.3d at 250, 551 N.E.2d at 1282, citing *Robbins*, 58 Ohio St.2d at 79-81, 12 O.O.3d at 87-88, 388 N.E.2d at 758-759; *Marts v. State* (1875), 26 Ohio St. 162, 167-168. This requirement derives from the common-law rule that the right to kill in self-defense may be exercised only if the person assaulted attempted to "retreat to the wall" whenever possible. Annotation, Homicide: Duty to Retreat Where Assailant and Assailed Share the Same Living Quarters (1969), 26 A.L.R.3d 1296, 1298.

{¶ 18} However, there is no duty to retreat when one is assaulted in one's own home. *Williford*, paragraph two of the syllabus. This exception to the duty to retreat derives from the doctrine that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack. Annotation, Homicide:

Duty to Retreat Where Assailant is Social Guest on Premises (1980), 100 A.L.R.3d 532, 533. The rationale is that a person in her own home has already retreated "to the wall," as there is no place to which she can further flee in safety. *Cannon v. State* (Fla.App.1985), 464 So.2d 149.

{¶ 19} Thus, a person who, through no fault of her own, is assaulted in her home may stand her ground, meet force with force, and if necessary, kill her assailant, without any duty to retreat. Annotation, Duty to Retreat, 26 A.L.R.3d at 1299.

{¶ 20} These common-law doctrines draw no distinction between cases in which the assailant has a right equal to the defendant's to inhabit the residence and cases in which the assailant is an intruder. There is no reason to make such a distinction. The majority of jurisdictions in the United States have held that there is no duty to retreat when one is attacked in one's own home, regardless of whether or not the assailant has a right to be in the home equal to that of the one being assailed. Annotation, Duty to Retreat, 26 A.L.R.3d 1296, with August 1996 supplement; *State v. Burtzlaff* (S.D.1992), 493 N.W.2d 1; *Bechtel v. State* (Okla.Crim.App.1992), 840 P.2d 1; *Robinson v. State* (1992), 308 S.C. 74, 417 S.E.2d 88; *State v. Allery* (1984), 101 Wash.2d 591, 682 P.2d 312. See, also, Angel, Criminal Law and Women: Giving the Abused Woman Who Kills *A Jury of Her Peers* Who Appreciate *Trifles* (1996), 33 Am. Crim.L. Rev. 229, 325; Madden, Clemency for Battered Women Who Kill Their Abusers: Finding a Just Forum (1993), 4 Hastings Women's L.J. 1, 32-34; Bigelow, Comment, Guilty of Survival: *State v. Strieby* and Battered Women Who Kill in Utah (1992), 92 Utah L.Rev. 979, 982, fn. 15, and 996-997; Maguigan, Battered Women and Self-Defense: Myths and Misconceptions in Current Reform Proposals (1991), 140 U.Penn.L.Rev. 379, 419-420; Mahoney, Legal Images of Battered Women: Redefining the Issue of Separation (1991), 90 Mich.L.Rev. 1, 83, fn. 373; Creach, Note, Partially Determined Imperfect Self-Defense: The Battered Wife Kills and Tells Why

(1982), 34 Stanford L.Rev. 615, 624. But, see, Annotation, Duty to Retreat, 26 A.L.R.3d 1296, with August 1996 supplement; *State v. Ordway* (R.I. 1992), 619 A.2d 819; *State v. Walton* (R.I. 1992), 615 A.2d 469; *Cannon v. State* (Fla.App.1985), 464 So.2d 149.

{¶ 21} In Ohio, one is not required to retreat from one's own home when attacked by an intruder; similarly one should not be required to retreat when attacked by a cohabitant in order to claim self-defense. Moreover, in the case of domestic violence, as in the case *sub judice*, the attacks are often repeated over time, and escape from the home is rarely possible without the threat of great personal violence or death. The victims of such attacks have already "retreated to the wall" many times over and therefore should not be required as victims of domestic violence to attempt to flee to safety before being able to claim the affirmative defense of self-defense.

{¶ 22} There is no rational reason for a distinction between an intruder and a cohabitant when considering the policy for preserving human life where the setting is the domicile, and, accordingly, we hold that there is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home.

II

{¶ 23} We next consider the issue of whether, when a defendant presents the defense of self-defense based on the theory of the battered woman syndrome, the judge's instructions to the jury regarding self-defense must include a detailed definition of the syndrome as we described in *State v. Koss* (1990), 49 Ohio St.3d 213, 216-217, 551 N.E.2d 970, 973-974.

{¶ 24} Appellant proposed the following jury instructions concerning the battered woman syndrome:

"The defendant has offered evidence on the 'Battered Woman[] Syndrome.' 'Battered Woman' includes wives or women in any form of intimate relationship

with men. Furthermore, in order to be classified as a battered woman, a couple must go through the battering cycle at least twice. If it occurs a second time and she remains in the situation she is defined as a battered woman.

"The defendant has raised the affirmative defense of self defense. The evidence offered concerning Battered Woman Syndrome, and that the defendant suffered from this syndrome, is evidence offered in determining whether the defendant acted out of an honest belief that she was in imminent danger of death or great bodily harm and the force used by the defendant was her only means of ending the danger.

"If the evidence establishes that the defendant is a battered woman and you determine that the expert is qualified to testify about the Battered Woman Syndrome, you may consider such testimony along with all of the other evidence in determining whether the defendant acted in self defense."

{¶ 25} The court rejected appellant's proposed instructions and gave the following instruction:

"To establish the defense of self defense, the following elements must be shown: (1) that Teresa Thomas was not at fault in creating the situation giving rise to the argument or fight; (2) that Teresa Thomas had an honest belief that she was in imminent danger of death or great bodily harm and that her only means of escape from that danger was in the use of such force; (3) that Teresa Thomas did not violate any duty to retreat or avoid the danger.

"If Teresa Thomas had reasonable grounds and an honest belief that she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was by killing Jerry W. Flowers, then she was justified even though she was mistaken as to the existence of such danger.

"Resort to the use of a deadly weapon is not permitted because of words. Vile or abusive language, or verbal threats, no matter how provocative, do not justify an assault or the use of a deadly weapon.

"In determining whether Teresa Thomas had reasonable grounds for an honest belief that she was in imminent danger, you must put yourselves in her position, with her characteristics, her knowledge or lack of knowledge, and under the circumstances and conditions that surrounded her at that time. You must consider the conduct of Jerry W. Flowers and determine if his acts and words caused her to reasonably and honestly believe that she was about to be killed or to receive great bodily harm.

"Testimony was offered concerning the battered woman syndrome, and that Teresa Thomas suffered from this syndrome. This testimony is offered to assist you in determining whether she acted out of an honest belief that she was in imminent danger of death or great bodily harm and that the force used by her was her only means of ending the danger. You may consider such testimony together with all the other evidence in determining whether she acted in self-defense.

"The law does not measure nicely the degree of force which may be used to repel an assault. However, if a person who is assaulted uses more force than reasonably appears to be necessary under the circumstances and if the force used is so grossly disproportionate to her apparent danger as to show revenge or an evil purpose to injure her assailant, then the defense of self-defense is not available.

"Teresa Thomas must establish that Jerry W. Flowers was the aggressor and that she did not herself provoke and cause the injury. The defense of self-defense is not available to the person who starts a fight unless, in good faith, she withdraws from the contest and informs the other party of her withdrawal, or by words or acts reasonably indicates that she has withdrawn and is no longer participating in the fight.

"If, in the careful and proper use of her faculties, Teresa Thomas honestly believed and had reasonable grounds to believe that Jerry W. Flowers was not able and did not intend to kill or do great bodily harm to her, then she, having notice of Jerry W. Flowers's position, was released from the danger, and the right to use force

9

in self-defense ended. If thereafter she continued to fight, she becomes the aggressor and a subsequent injury to Jerry W. Flowers is unlawful."

{¶ 26} Thus, the instructions proposed by appellant that the trial court did not include in the jury charge would define battered women as those women in intimate relationships that have gone through the battering cycle at least twice. The instructions would further state that if the cycle occurs a second time and the victims remain in the situation, they are defined as battered women.

{¶ 27} As stated above, the second element of the affirmative defense of self-defense requires the defendant to prove that she had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force. *State v. Williford* (1990), 49 Ohio St.3d 247, 249, 551 N.E.2d 1279, 1281, citing *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus.

{¶ 28} In *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970, at paragraph three of the syllabus, we held that expert testimony explaining the characteristics of the battered woman syndrome is admissible to "assist the trier of fact to determine whether the defendant acted out of an honest belief that she is in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." Accordingly, evidence of the battered woman syndrome serves to support the defendant's argument under the second element of self-defense and does not establish a new defense or justification independent of the defense of self-defense. *Id.*

{¶ 29} The trial court's instructions correctly emphasized to the jury that the second element of self-defense is a combined subjective and objective test. As this court established in *State v. Sheets* (1926), 115 Ohio St. 308, 310, 152 N.E. 664, self-defense "is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." (Emphasis *sic*.) See, also, *McGaw v.*

*State* (1931), 123 Ohio St. 196, 174 N.E. 741, paragraph two of the syllabus. In *Koss*, we once again stated this test by approving similar jury instructions to those given in the case *sub judice*:

"'In determining whether the Defendant had *reasonable* grounds for an *honest* belief that she was in imminent danger, you must put yourself in the position of the Defendant * * *. You must consider the conduct of [the assailant] and determine if such acts and words caused the Defendant to *reasonably* and *honestly* believe that she was about to be killed or to receive great bodily harm.'" (Emphasis added.) *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d at 973. Thus, the jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she *reasonably* believed she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *State v. Shane* (1992), 63 Ohio St.3d 630, 634, 590 N.E.2d 272, 276. This standard is sometimes labeled the "reasonable battered woman standard." See Cahn, The Looseness of Legal Language: The Reasonable Woman Standard in Theory and in Practice (1992), 77 Cornell L.Rev. 1398, 1409-1410. Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that she was in imminent danger. See 1 LaFave & Scott, Substantive Criminal Law (1986, Supp. 1996) 654, Supp. 71, Section 5.7. See, also, generally, *Shane*, *supra*, 63 Ohio St.3d at 634, 590 N.E.2d at 276. This same two-prong standard is used in a number of states. See, *e.g.*, *State v. Ordway* (R.I. 1992), 619 A.2d 819, 824; *State v. Burtzlaff* (S.D. 1992), 493 N.W.2d 1, 7; *Bechtel v. State* (Okla.Crim. 1992), 840 P.2d 1, 10-11; *Robinson v. State* (1992), 308 S.C. 74, 79, 417 S.E.2d 88, 91; *State v. Vigil* (1990), 110 N.M. 254, 257, 794 P.2d 728, 731; *State v. Norman* (1989), 324 N.C. 253, 260-261, 378 S.E.2d 8, 12-13; *Commonwealth v. Stonehouse* (1989), 521 Pa. 41, 59, 555 A.2d 772, 781; *State v.*

*Stewart* (1988), 243 Kan. 639, 649, 763 P.2d 572, 578-579; *State v. Allery* (1984), 101 Wash.2d 591, 594-595, 682 P.2d 312, 314-315; *State v. Leidholm* (N.D. 1983), 334 N.W.2d 811, 817-818.

{¶ 30} The jury instructions given by the trial court in the case *sub judice* properly instructed the jury to consider all the circumstances when determining if appellant had an objectively reasonable belief of imminent danger and whether she subjectively honestly believed she was in danger of imminent harm.

{¶ 31} Appellant's requested instructions would attempt to more precisely define the battered woman syndrome and would require the jury to determine whether appellant was a battered woman in order to find that appellant believed she was in imminent danger. Adding these proposed instructions would therefore set up an entirely separate defense, rather than charge the jury to consider the syndrome when the jury determines appellant's state of mind regarding the second element of self-defense. This addition, therefore, would have been improper.

{¶ 32} Accordingly, we reverse the court of appeals as to the duty to retreat between cohabitants and affirm as to the jury instruction regarding the battered woman syndrome.

*Judgment reversed in part*
*and affirmed in part.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and STRATTON, JJ., concur.

STRATTON, J., concurs separately.

PFEIFER and COOK, JJ., dissent.

_____

**STRATTON, J., concurring.**

{¶ 33} This case poses a troubling issue of a balancing of societal interests. There are strong public policies for preserving the sanctity of life on one hand and, on the other hand, for allowing one to protect oneself from harm in one's own home.

**{¶ 34}** However, the issues involved in domestic violence complicate any attempt to consider a duty to retreat from one's own home. Domestic violence is the result of the abuser's need to dominate and control. Often the risk of violence against a woman is heightened when she attempts to <u>leave</u> the abusive relationship. See Mahoney, Legal Images of Battered Women: Redefining the Issue of Separation (1991), 90 Mich.L. Rev. 1, 5-6. Research demonstrates that the battered woman's attempt to retreat often increases the immediate danger to herself. Statistics show that a woman is at the greatest risk of death when she attempts to leave a relationship. See Dutton, Understanding Women's Response to Domestic Violence (1993), 21 Hofstra L. Rev. 1191, 1212. The abuser may perceive his mate's withdrawal, either emotionally or physically, as a loss of his dominance and control over her, which results in an escalation of his rage and more violence. Walker, Battered Women Syndrome and Self-Defense (1992), 6 Notre Dame Journal of Law, Ethics & Public Policy 321, 334.

**{¶ 35}** In the case *sub judice*, the defendant testified of abuse and violence and presented expert testimony that she was suffering from battered woman syndrome. She testified that on the day in question, her boyfriend had already flown into a rage. He returned home from work early and entered the trailer screaming. She retreated to the bathroom but, unable to escape outside, ran to a closet and got a gun. She then returned to the kitchen, where Flowers continued to threaten her. She fired two warning shots, yet he continued to approach. Even after being shot, he continued to threaten her.

**{¶ 36}** Had the defendant gotten around Flowers to the door of the small trailer, would her attempt to escape the altercation have increased the risk of *her* death? Would Flowers have become further enraged and tried to kill her? Under these circumstances, imposing a duty to retreat may have greatly increased the risk of a violent attack upon the defendant.

**{¶ 37}** I do not believe we can ignore the issues of domestic violence wrapped up in this case. An instruction on the battered woman syndrome given in conjunction with an instruction that there is no duty to retreat from one's own home could have changed the outcome of this case. We cannot know how the jury would have decided this tragic fact pattern had they been given instructions that properly allowed them to evaluate the battered woman syndrome with <u>no</u> duty to retreat.

**{¶ 38}** In cases where there are no issues of domestic violence or battered woman syndrome, the jury can still weigh all these competing interests in assessing the reasonableness of the defendant's response to and whether the defendant used more force than necessary to repel his or her attacker. The jury can still judge whether he or she could have reasonably avoided the danger.

**{¶ 39}** Therefore, I concur with the majority.

_____

**PFEIFER, J., dissenting.**

**{¶ 40}** The sanctity of human life must pervade the law. Accordingly, a cohabitant should be required to attempt to retreat before resorting to lethal force in self-defense against another cohabitant. I respectfully dissent.

**{¶ 41}** In reaching its holding that "[t]here is no duty to retreat from one's own home," the majority states, "There is no rational reason for a distinction between an intruder and a cohabitant when considering the policy for preserving human life where the setting is the domicile." To the contrary, there is at least one: the number of times the situation arises. While there are all too many instances of unknown people intruding into the homes of others, the number of such occurrences is negligible compared to the number of times cohabitants are in their home together.

**{¶ 42}** There are dramatically more opportunities for deadly violence in the domestic setting than in the intrusion setting. Thus, to hold that cohabitants do not have to retreat before resorting to lethal force is to invite violence. Cohabitants

should be required to retreat before resorting to lethal force in self-defense whenever it can be done safely. Such a duty would encompass leaving the home if that is necessary to prevent the destruction of life. It would also encompass retreating to the wall.

{¶ 43} Finally, whatever you think about the first four shots, it is unconscionable to suggest that the last two shots were fired in self-defense. The law of self-defense has hitherto always been a shield. In this case, the majority is allowing the defendant to use the law of self-defense as a sword. I dissent.

COOK, J., concurs in the foregoing dissenting opinion.

_____

**COOK, J., dissenting.**

{¶ 44} I respectfully dissent. Contrary to the fears expressed by the majority and concurring opinions, imposing the duty to retreat upon cohabitants would not leave the occupant of a home defenseless from attacks. First, a person is relieved of the duty where there is no reasonable or safe means to avoid the confrontation. *State v. Williford* (1990), 49 Ohio St.3d 247, 250, 551 N.E.2d 1279, 1282. Accordingly, the use of deadly force is justified and the failure to retreat is of no consequence where retreat would increase the actor's own danger of death or great bodily harm. See, generally, Annotation, Homicide: Duty to Retreat Where Assailant and Assailed Share the Same Living Quarters (1969), 26 A.L.R.3d 1296, 1298. Second, the duty to retreat is limited and requires a "retreat to the wall" rather than a retreat from the home.

{¶ 45} For these reasons, I would hold that a person assaulted by another cohabitant in the home is obliged to "retreat to the wall" before defending with deadly force, provided that a reasonable and safe means of avoiding the danger exists.

PFEIFER, J., concurs in the foregoing dissenting opinion.

_____