OPINION
Defendant-appellant Michael Snell appeals from his conviction and sentence for Felonious Assault and Aggravated Robbery. He contends that his conviction is against the manifest weight of the evidence. In support of this contention, he points to some inconsistencies in the testimony of the alleged victim and his girlfriend, who were eyewitnesses. From our review of the record, we conclude that these discrepancies were not of sufficient magnitude to render the testimony inherently incredible. Accordingly, we cannot conclude that the jury lost its way in finding this testimony to be credible, and the judgment of the trial court is Affirmed.
 I
In the early morning hours of June 2, 2001, William Cody and his girlfriend, Patricia Johnson, were walking home from a bar where they had been drinking and dancing, with another couple, for some time. Although they both testified that they were under the influence of alcohol, feeling a "buzz," they both denied that they were intoxicated to the point of insensitivity to their surroundings.
As they were walking in the vicinity of the Neon Movies, in downtown Dayton, they passed defendant-appellant Michael Snell, who was walking in the opposite direction. Just after passing Cody and Johnson, Snell asked for a cigarette. Snell testified that he offered to purchase a cigarette for twenty-five cents. In any event Cody gave Snell a cigarette, free of charge. Snell then offered to share a bowl of marijuana with Cody, and Cody accepted. They went behind the Neon Movies, Johnson following ten to fifteen feet behind. Snell took the bowl of marijuana out of his pocket, lit it, took a "hit," and then offered it to Cody, holding it out in his hand.
Here, the testimony diverges. According to Snell, Cody took the bowl, but the marijuana went out, and Cody had trouble relighting it. When Snell offered to assist, Cody put the bowl of marijuana in his pocket. When Snell demanded it back, Cody began hitting him. Snell then got a knife from his pocket, but had not succeeded in opening it by the time he was on the ground, fending off Cody's attack. Cody and Johnson testified that when Cody went to accept the bowl of marijuana, Snell punched him. Then, Snell pulled the knife from his pocket and began waving it back and forth at Cody. Cody put up his hands, trying to protect his body and head from the knife. Snell then turned, with the knife at least temporarily down by his side, as if to approach Johnson. At this point, Cody jumped Snell, knocking him to the ground.
From here, the testimony converges. Cody pulled Snell's jacket up over his face so that Snell could not see, and Snell began waving the knife blindly. At some point, Cody was cut. Cody was able to get the knife away from Snell, and Johnson took the knife and threw it into a drainage ditch. Cody continued his attack on Snell, hitting and kicking him. Cody testified that his purpose was to prevent Snell from renewing the attack. Snell pleaded with Cody to desist, and Johnson told Cody it was time to break off. Cody then walked away with Johnson.
Although Cody was apparently bleeding profusely, his plan was to let Johnson lead him to her mother's home on Wyoming Street. When they got there, Johnson's mother called police and an ambulance. Cody was taken to Miami Valley Hospital, where he was treated and released. Later that morning, he and Johnson retrieved the knife from the drainage ditch and later gave it to the police.
Snell made his way to the front of the Neon Movies, where the manager offered to call the police. Snell accepted the invitation. When the police responded, Snell initially reported that he had been assaulted by a black man and his girlfriend. Cody is white. Later, however, Snell said he corrected this. Snell eventually disclosed the role of marijuana in the events, but nevertheless told the investigating police officer that he did not wish to file a complaint, since he was afraid he would get into trouble. Snell had just been released from prison thirty days earlier. Snell accepted a ride from the police officer to the place where he was then staying.
Snell was arrested and charged with Felonious Assault and Aggravated Robbery. A jury found him guilty on both counts, and he was sentenced accordingly. From his conviction and sentence, Snell appeals.
 II
Snell's sole assignment of error is as follows:
 THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Snell cites State v. Thompkins (1997), 78 Ohio St.3d 380, for the proposition that we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether when resolving conflicts in the evidence, the jury clearly lost its way.
In State v. Thompkins, supra, the issue was how much weight to give competing inferences. We have distinguished situations involving a review of the weight to be given to the credibility of conflicting testimony:
 Because the factfinder, be it the jury, or as in this case, the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (August 22, 1997), Montgomery App. No. 16288, unreported.
Consistently with our obligation under State v. Thompkins, supra, we have reviewed the entire transcript of Snell's trial. Although there are some discrepancies in the testimony of Cody and Johnson, in our view they are not of such magnitude as to render unreasonable the jury's decision to credit their testimony.
The first of the inconsistencies set forth in Snell's brief is a claimed inconsistency in Johnson's testimony concerning the degree of Cody's intoxication. Snell claims that at trial, Johnson minimized Cody's level of intoxication, inconsistently with her testimony on a previous occasion. Neither Johnson nor Cody purported to be able to recall exactly how many beers and whiskeys Cody had consumed at the bar. When Johnson testified that Cody, although having a "good buzz," was not "falling-over drunk," Snell confronted her with her testimony on a prior occasion:
 Draw your attention to Page 27 of this transcript, Line 17, starting out with —
A. Yeah. (Reading.) Yes.
Q. So you said actually he was drunk.
A. Yeah, he was pretty — I mean —
Q. But I mean, that's what you said before.
A. Yes.
Q. That he had been drinking all night.
A. Yes; we both had.
In our view, Snell has failed to demonstrate the claimed inconsistency. It is clear from the trial testimony of both Cody and Johnson that both had been drinking beer, at least, for several hours at the bar. That Cody had been "drinking all night" does not establish that he was "falling-over drunk," which was all that Johnson denied at trial.
Snell next argues that the testimony of Cody and Johnson should not be believed because of an inconsistency in Johnson's testimony concerning whether Cody actually ever got his hands on the bowl of marijuana. This cross-examination testimony at the trial was as follows:
 Q. Let me back you up a little bit, Miss Johnson. When the three of you went around behind the Neon Movies and you saw my client with this bowl, you saw him hand it towards William, didn't you?
 A. Actually, I knew one of them had the bowl. I wasn't — I'm not sure if he handed the bowl to him. I just knew one of them had it and that's what they was going back there to do, to smoke the bowl.
 Q. Again, do you remember being asked that question before?
A. Yes.
 Q. And do you remember saying that William took the bowl?
A. Yes.
Q. But now you're saying that's not what happened?
 A. All I remember is, like I said, they had it in their hand. I guess they was going to smoke it. I'm not sure if, you know, if he was trying to smoke it, had the bowl.
 Q. So the last time we were in court, you said that William took the bowl, and now you're saying you don't know if he had it or not.
 A. He had it in his hand, so I don't know if he actually smoked it.
Q. But William actually had the bowl in his hand.
 A. I guess — he was trying to grab for it and he hit him in his eye and that's when they started fighting.
Q. Who was trying to grab for it?
 A. William was trying to grab for the bowl and that's when he hit him in the eye.
Q. William actually grabbed the bowl.
 A. No, he didn't grab the bowl. He was trying to grab for it.
 Q. But in the earlier hearing, you remember that you said that he did grab the bowl?
A. Yes.
Q. That William grabbed the bowl.
A. I remember saying that, yes.
Q. And now you're saying he didn't get the bowl.
 A. I'm not saying he didn't get the bowl. But I know he had the bowl — the defendant had the bowl and was trying to hand it to him, and that's when he hit him in his face.
From our review of this testimony, it is not clear whether Johnson's prior testimony concerning Cody's contact with the bowl of marijuana is actually in conflict with her trial testimony. If it is, we view it as a minor inconsistency, having no great significance.
Snell next argues that at trial, Johnson "claimed she did not recall Snell trying to get away." Snell argues that this is inconsistent with her prior testimony, but Snell has failed to establish the inconsistency. The cross-examination testimony to which Snell refers is as follows:
 Do you remember saying he was in circles and he was telling him to get away?
A. No.
 Q. If you would read, please, the paragraph at the top of Page 30, Lines 1 through 6.
A. (Reading.)
Q. Are you finished?
A. Yes.
Q. Does that refresh your recollection?
 A. No. I know some of the stuff in that book is not exactly — some of it's wrong.
It's wrong?
A. Yes.
Q. You're saying that you didn't say that?
 A. When he had the knife in his hand, he wasn't saying anything. I just said, "He has a knife, let's go."
 Q. So when you testified earlier that he — in this thing — "he" means my client, right? — was telling him to get away, you're saying that that's not the way you remember it now?
 A. No. He had the knife and I said, "He's got a knife, let's go." That was — that was what was said. There wasn't no conversation or nothing. I said, "He's got a knife, let's go."
 Q. So your testimony today is you don't remember my client trying to get away.
A. No.
At most, Snell succeeded in eliciting from Johnson her testimony that "some of the stuff in that book [presumably the transcript of a prior proceeding] is not exactly — some of it's wrong." Snell failed, however, to offer proof of any prior inconsistent statement. Johnson did not acknowledge that she had made a prior inconsistent statement. Snell might have offered the court reporter who transcribed the prior proceeding or some other proof of the prior inconsistent statement, but he failed to do so. Therefore, he failed to establish the inconsistency that he claims existed with respect to Johnson's testimony concerning Snell's having said something about wanting to get away. Furthermore, even if Snell had announced his desire to break away from the altercation, both Cody and Johnson testified to the fact that Snell had been menacing Cody, at least, with the knife before then. In view of the way that the altercation commenced, which, according to both Cody and Johnson, was by Snell sucker-punching Cody, Cody could reasonably have discounted Snell's statements concerning his desire to break off. The knife was still in Snell's hand, and Cody could reasonably have concluded that the best thing to do to protect himself and Johnson was to jump on Snell. In this event, which is consistent with a rational view of the evidence, Snell would hardly have been without fault in the circumstances leading up to the cutting of Cody with the knife, thereby vitiating his defense of self-defense. State v. Thomas (1997), 77 Ohio St.3d 323,326.
Finally, Snell contends that the testimony of Cody and Johnson is unbelievable because of their account of what happened after the altercation. Despite the fact that Cody was bleeding, and Cody told Johnson "I don't think I'm going to make it, I don't think I'm going to make it, I think I lost too much blood," they walked past a Sunoco and a Dairy Mart, walking two miles to Johnson's mother's house. Johnson did testify that at some point she ripped her pants and "had my pants wrapped around his face to stop it from bleeding so bad." Whether this was before or after Cody having expressed doubt that he was going to make it is not clear.
Snell argues that it is inherently incredible that Cody and Johnson would walk the two miles to her mother's house if Cody was injured that badly. This was a point worth arguing to the jury. The jury might have concluded that neither Cody nor Johnson were entirely rational after the incident. They might also have concluded that Johnson assessed Cody's injury as being less serious than Cody did, and believed that Cody could make it to the security of her mother's house.
If Cody's and Johnson's versions of events were not free from some puzzling aspects, neither was Snell's. Snell never offered any explanation for his having told the police officer that his assailant was black, although he acknowledged that he did initially tell the police officer that. Furthermore, he never explained why he asked the manager at the Neon Movies to call the police, but later declined to file a police report and request an investigation. The jury may have inferred that Snell's calling the police was a defensive measure in case Cody should contact the police, since his calling the police would suggest his innocence, but that Snell did not want to cause a criminal investigation, fearing that his version of events would not withstand scrutiny.
In any event, the jury was presented with conflicting testimony, and made its decision to credit the testimony of Cody and Johnson, and not Snell's testimony. From our review of the entire transcript, we conclude that the testimony of Cody and Johnson is not inherently incredible, and that the jury could reasonably have decided to believe their testimony.
Snell's sole assignment of error is overruled.
 III
Snell's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and YOUNG, J., concur.