DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Ottawa County Court of Common Pleas that found appellant guilty of two counts of felonious assault. For the reasons that follow, this court affirms the judgment of the trial court.
 {¶ 2} Appellant sets forth the following assignments of error:
 {¶ 3} "1) The Verdict of the Jury was against the manifest weight of the evidence.
 {¶ 4} "2) The Trial Court erred to the prejudice of the Defendant in failing to instruct the Jury that if the Defendant was assaulted in his home or place of residence, the Defendant had no duty to escape and could use such means as are necessary to repel the assailant from the home or residence, including an assailant who is a co-habitant of the same home or residence with an equal right to be in the home or residence, even to the use of deadly force, provided that the Defendant had reasonable grounds to believe and an honest belief that the use of deadly force was necessary to repel the assailant. State v. Thomas (1977),77 Ohio St.2d 323."
 {¶ 5} The undisputed facts that are relevant to the issues raised on appeal are as follows. On October 7, 2002, appellant was indicted on two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2) in connection with the September 28, 2002 assault on Kenneth Wagner. Appellant entered pleas of not guilty and the case proceeded to trial before a jury on December 17 and 18, 2002. The following evidence was adduced.
 {¶ 6} Kenneth Wagner, the victim, testified that at the time of the assault he had been living with his girlfriend, Lori Oakman, in her home on Humphrey Road in rural Oak Harbor, Ottawa County, for approximately one month. He further testified that appellant, who was a relative of Lori, had lived with them about one week. Wagner stated that he and appellant did not have any trouble getting along, although appellant had made a couple of comments about Lori that Wagner did not like. He stated that he told appellant he did not appreciate the way he was talking about Lori but the two did not have any physical contact over that issue. Wagner testified that when he came home on the night of the assault, appellant was sitting on the couch. Wagner put a movie on and sat on the floor. Wagner stated that he was drifting in an out of sleep and heard appellant get up and leave the room briefly. The next thing he knew, he felt three or four blows to his head. He turned around and faced appellant and saw that he was being hit with a crescent wrench. Appellant continued to hit Wagner in the face. Wagner was able to push appellant off him but could not see because of blood running into his eyes. Wagner testified that appellant told him to "[g]et the f*** out of here" and that he started to back out of the room. Wagner left the house with appellant staying close beside him, got into his van and drove away. He testified that as he drove away, he felt cold and dizzy and started to shake quite a bit. He drove toward Lori's parents' house for help but what should have been a 10-minute drive took at least half an hour because he had to pull over and rest. When he arrived at their house, there was no answer at the door so he went back to his van and lay down in the back. He recalled that three or four hours later he walked up to the house again, and Lori's step-father saw him. Wagner lay down on the porch until the rescue squad arrived. He estimated that appellant struck him 10 or 12 times during the attack and said he received over 40 stitches and staples in his face and head. Wagner further testified that, as a result of the beating, he has trouble sleeping and experiences bad headaches.
 {¶ 7} Lori Oakman testified that at the time of the assault Wagner was living with her. Appellant had come to Ohio from Pennsylvania about one week before the assault and she was allowing him to stay with her until he got on his feet. She stated that she was out when the assault occurred but came home around 4:00 a.m. and saw appellant on the couch. She further testified that she asked appellant where Wagner was and he said that they had gotten into a fight. She then saw blood in the kitchen. She testified that she told appellant to leave and called her step-father. Oakman stated that there was a pool of blood on the living room floor where Wagner had a habit of lying when he watched television. She further stated that when she saw appellant that night she did not observe any blood on him and said he did not claim that he had suffered any injuries.
 {¶ 8} Ottawa County Deputies James Karr and Brad York testified as to their investigation of the assault on September 28, 2002. Deputy Karr stated that on that night he responded to a call regarding a person with injuries resulting from a fight that had occurred earlier that night. When Karr arrived at the address given him, he found Wagner, who appeared to be seriously injured, lying on the floor shivering, his face covered with dried blood. He testified that Wagner continued to bleed and seemed to "lose control." After Wagner was taken to the hospital, Karr went to the address where he had been told appellant could be found. When he arrived, he found appellant standing outside the house. Appellant showed no signs of injury and appeared calm. He was cooperative and admitted involvement in the fight with Wagner. Deputy Karr handcuffed appellant and turned him over to Sergeant York before going into the house to look for Oakman. Karr testified that he noticed a large amount of blood throughout the kitchen, a large blood stain on the floor in the living room in front of the television, and blood in the bathroom. Officers also found a flare gun in the living room and a wrench by the kitchen door. Karr testified that the flare gun, found on a chair, did not appear to have been discharged and had no blood on it.
 {¶ 9} Appellant testified as follows. He left his home in Pennsylvania and traveled to Ohio the second week of September 2002. He stated that the first week he stayed with his sister and looked for work. He then moved in with Lori Oakman, the daughter of one of his sister's co-workers, with the understanding that he would help Oakman around the house if he could stay for two weeks while he continued to look for a job. Appellant testified that once or twice he had tried to stop Wagner from yelling at Oakman which caused Wagner to "get in his face." On the night of the assault, appellant left the house for a while and shortly after he returned, he and Wagner sat in the living room drinking beer. At one point, Wagner went to a cabinet and took out a flare gun he owned. Appellant testified that a few minutes later, Wagner put a bullet in the flare gun and about a half hour later said to appellant, "This is for either you or Lori." Appellant then testified that he went to the bathroom, got the wrench used in the attack, put it in his pocket and went back to the living room. He stated that Wagner was "flashing that gun in my face" and that when Wagner turned his head he got out of the chair and hit him in the head. He further testified that Wagner kept coming after him so he kept "bird tapping" Wagner, or as he described it, putting the wrench close to Wagner's head and "flicking it." At one point, Wagner dropped the flare gun but couldn't see to pick it up because of the blood running in his eyes. He testified that he kept on hitting Wagner after the gun fell to the floor because Wagner kept grabbing at it. Appellant stated that he then picked Wagner up, body slammed him to the floor, jumped on him, put his forearm across his neck and "asked him about three times to leave." He further testified that when Wagner finally got up and started to leave, he followed Wagner to the door and ordered him to get out, telling him that the next time he would "make it count." He stated that he then "directed" Wagner to his van and watched him drive away. Appellant testified that he then cleaned up inside and eventually sat down and fell asleep in the living room until Oakman came home. He stated that he was not injured at all but that he felt the need to defend himself because he believed Wagner was crazy and would use the flare gun against him. He stated that he was not mad at Wagner but "bird tapped" him 14 or 15 times and that he "might have" lost his temper after the first couple of blows. Appellant admitted that he made no attempt to leave the house even though he felt threatened by the flare gun and that he in fact continued to watch television with Wagner for a while after Wagner got the gun.
 {¶ 10} Appellant was found guilty on both counts and on March 27, 2003, was sentenced to seven years imprisonment on the first count only. It is from that judgment that appellant appeals.
 {¶ 11} In his first assignment of error, appellant asserts that the jury's verdict was against the manifest weight of the evidence. In support, appellant argues that he acted in self-defense after Wagner waved the flare gun in his face and that he continued to "bird tap" Wagner only after Wagner continued to come after him.
 {¶ 12} Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other.State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence: "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 21, 42.
 {¶ 13} To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
 {¶ 14} This court has thoroughly reviewed the evidence in this case as summarized above and finds no indication that the trier of fact lost its way or created a manifest miscarriage of justice by finding appellant guilty of two counts of felonious assault. Further, appellant's extensive testimony clearly does not support a claim of self-defense. In order to support the affirmative defense of self-defense, appellant would have to have shown that he was not at fault in creating a violent situation; that he had a bona fide belief that he was in imminent danger of death or great bodily harm with his only means of escape being through the use of force; and that he did not violate a duty to retreat or avoid the danger. See State v. Thomas (1997), 77 Ohio St.3d 323. Appellant's own testimony fails to support a claim that he was not at fault in creating the violent situation that led to Wagner's brutal injuries or that he believed his only means of escape was through the use of force. Appellant testified that Wagner left the house two or three times for at least 10 minutes each time after he allegedly brandished the flare gun and that he, appellant, remained in the living room each time. As for the last element, while there is no duty to retreat when one is assaulted in one's own home, State v. Williford (1990), 49 Ohio St.3d 247, there is no evidence in the record that the incident took place in appellant's home. Lori Oakman testified that appellant's sister had asked her if appellant, whom Oakman had never met, could stay with her until he was able to get on his feet, and that she did not expect him to stay there long. By appellant's own testimony, he was staying in Oakman's home only for a week or two while he looked for work. He was not paying rent and in fact had never met Oakman until one week before the assault. Thus, as the assault did not occur in appellant's home, he did have a duty to retreat. Accordingly, the jury's verdict was not against the weight of the evidence and appellant's first assignment of error is not well-taken.
 {¶ 15} As his second assignment of error, appellant asserts that the trial court erred by instructing the jury that appellant had a duty to retreat. While it is not specifically set forth under this assignment of error, this court construes appellant's argument to be that Oakman's house was also appellant's home and that he therefore did not have a duty to retreat.
 {¶ 16} The trial court in this case gave the standard instructions on the duty to retreat and self-defense. As to self-defense, the trial court stated: "To establish self-defense, the defendant must prove: (A) he was not at fault in creating the situation giving rise to the injury to Kenneth Wagner; and (B) he had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm, and that his only means of retreat, escape, or withdrawal from such danger was by the use of deadly force." As to the duty to retreat, the trial court instructed the jury: "The defendant had a duty to retreat if (A) the defendant was at fault in creating the situation giving rise to the injury to Kenneth Wagner, or (B) the defendant did not have reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm, and that his only means of escape from that danger was by the use of deadly force." Contrary to appellant's claim, the trial court did not instruct the jury that appellant had a duty to escape or retreat.
 {¶ 17} A determination as to jury instructions is a matter left to the sound discretion of the trial court. State v. Guster (1981),66 Ohio St.2d 266, 271. "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of an * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." Feterle v. Huettner (1971), 28 Ohio St.2d 54, at the syllabus.
 {¶ 18} Based on the evidence as summarized above, we find that the trial court did not err by failing to instruct the jury that if appellant was assaulted in his own home he had no duty to retreat. The record in this case simply did not contain evidence from which the jury might reach the conclusion, as suggested by appellant, that he committed the assault in his own home and therefore had no duty to retreat. Accordingly, appellant's second assignment of error is not well-taken.
 {¶ 19} On consideration whereof, this court finds that appellant was not prejudiced and the judgment of the Ottawa County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellant.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, J., Concur.