OPINION
{¶ 1} Appellant, Anthony Cunningham, timely appeals his conviction for assault, in violation of R.C. 2903.13(A) a misdemeanor of the first degree, following his bench trial held in the Columbiana County Municipal Court. Appellant's conviction stems from an altercation over a female acquaintance, which occurred in Salem, Ohio. Appellant was sentenced to 180 days in the county jail, which was to be suspended upon the completion of four years intensive probation. He was also ordered to perform 80 hours of community service, attend anger management counseling, and pay a $500 fine. (Aug. 2, 2006, Judgment Entry.)
 {¶ 2} Appellant subsequently filed a motion with the trial court requesting it to amend its sentencing decision to conform to the sentence announced at trial. The trial court granted the motion, amending Appellant's sentence to reflect that his jail time would be suspended upon completion of two years probation, not four. The other terms of his sentence were unchanged. (Sept. 22, 2006, Judgment Entry.) The trial court stayed Appellant's sentence pending his appeal. (Aug. 30, 2006, Judgment Entry.)
 {¶ 3 } Appellant raises three assignments of error on appeal. He argues that his conviction was not supported by sufficient evidence and that it was against the manifest weight of the evidence. He also argues that the trial court erred in rejecting his self defense claim. Our review of the record reveals, however, that his conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Further, the trial court did not err in rejecting his claim of self defense. *Page 3 
Thus, the decision of the Municipal Court of Columbiana County, Ohio, is hereby affirmed in full.
 {¶ 4} We address Appellant's first two arguments collectively. In his first two assignments, Appellant claims:
 {¶ 5} "THE TRIAL COURT ERRED BY NOT REQUIRING THE STATE TO ADEQUATELY MEET ITS BURDEN TO PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.
 {¶ 6} "THE TRIAL COURT ERRED BY CONVICTING DEFENDANT-APPELLANT OF ASSAULT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 7} When an appellate court reviews the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found that the elements of the crime were proven beyond a reasonable doubt.State v. Dennis (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096. A guilty verdict should not be reversed on appeal unless reasonable minds could not find the result reached by the trier of fact. Id., citingState v. Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
 {¶ 8} In contrast, when reviewing a challenge to a conviction on manifest weight of the evidence grounds, a court of appeals must review the record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed *Page 4 
and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380,387, 678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717. Further, the trier of fact's determinations as to witness credibility must be given deference.
 {¶ 9} Appellant was convicted of assault in violation of R.C.2903.13(A) which states, "[n]o person shall knowingly cause or attempt to cause physical harm to another * * *." R.C. 2901.22, entitled culpable mental states, defines "knowingly":
 {¶ 10} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 11} Contrary to Appellant's claims, a review of the evidence and trial transcript support his conviction.
 {¶ 12} Daniel Brookes, the victim of Appellant's assault, was the state's first witness. He testified that on December 27, 2005, he arrived at the apartment of Scott Rudder in Salem, Ohio, at about midnight. Appellant was asleep in Scott's bedroom. Daniel was there to pick up a bed that Scott was giving to him. Daniel intended to take the bed to his girlfriend's apartment, who lived in the same complex. Instead, Daniel and Scott drank several beers together. (Tr., pp. 7-8, 17.)
 {¶ 13} Daniel's girlfriend, Mary Booth, later arrived at Scott's apartment, and the three continued to drink. According to Daniel, Mary kept encouraging him to talk to Appellant. In response, Daniel repeatedly knocked on the door to the bedroom in *Page 5 
which Appellant was sleeping. Daniel explained that Appellant did not seem troubled by the interruption at first. Appellant came out twice, talked with Mary, and then went back into the bedroom closing the door behind him. (Tr., pp. 8-10.)
 {¶ 14} Daniel said that he and Mary later got into an argument. During the argument, Appellant exited the bedroom and attacked him, beating him with his fists. Appellant struck Daniel in the back of the head and on his nose, causing it to bleed. Daniel later had swellings down the side of his head. He estimated that Appellant hit him about 20 times, but denied that he struck back at Appellant, instead claiming that he took cover on the couch. Scott eventually stopped the altercation. Daniel surmised that Appellant started the fray because Appellant was upset with him for arguing with Mary. (Tr., pp. 11-12.)
 {¶ 15} Immediately thereafter, Daniel went to Mary's apartment and called the police. The police arrived and took photos of his injuries. State's Exhibits A and B depict Daniel's injuries. His nose was split open and it was bleeding profusely, but he refused medical treatment. (Tr., pp. 12-13, 15, 24.)
 {¶ 16} On cross-examination, Daniel acknowledged that he, Scott, and Mary had been drinking quite a bit that night; that they were probably loud; and that he did not recall everything that had happened. He also admitted that he accused Appellant of having a sexual relationship with Mary the third time he entered the bedroom. (Tr., pp. 20, 22.) *Page 6 
 {¶ 17} Notwithstanding, Daniel adamantly denied raising his hands toward Appellant. He said that he did not defend himself from Appellant's attack because he did not have a chance. (Tr., pp. 25-26.)
 {¶ 18} Scott Rudder also testified for the state. Scott stated that on the night of December 27, 2005, he was in his apartment talking with Mary Booth when Daniel Brookes arrived, banging on Scott's door. Daniel was drunk and upset with Mary for being at Scott's apartment. Scott testified that at the time, Appellant was in the kitchen using the telephone in an effort to find a place to stay. Scott denied that Appellant was staying there or sleeping just prior to this incident. (Tr., pp. 27-28, 29, 32.) Later questioning revealed that Scott may have been subject to losing his housing assistance had someone else been living in his apartment.
 {¶ 19} Scott testified that both Daniel and Appellant were dating Mary at the same time. Daniel kept agitating Appellant that night until Appellant came out and, "beat the crap out of him." (Tr., p. 29.) Scott stopped Appellant and told them both to leave. Scott confirmed that he, Mary, and Daniel had been drinking that night, but that Appellant was not. (Tr., pp. 30, 38.)
 {¶ 20} Scott initially said that Daniel did not have a chance to defend himself. However, Scott explained on cross-examination that he did not see the initial altercation between Appellant and Daniel, but that it sounded like Daniel had thrown the first punch. Scott's testimony also revealed the following:
 {¶ 21} "Q. He [Daniel] didn't jump up off that couch swinging?
 {¶ 22} "A. I could not see it at that time. *Page 7 
 {¶ 23} "Q. You don't recall?
 {¶ 24} "A. No. Like I said we were all drinking.
 {¶ 25} "Q. So, it's — it's possible that he [Daniel] actually threw the first punch?
 {¶ 26} "A. From what I heard it sounded like to me that he [Daniel] did.
 {¶ 27} "Q. That he did?
 {¶ 28} "A. I hear — I heard a big smack, yes.
 {¶ 29} "* * *
 {¶ 30} "Q. Okay. And it's fair to say that these two gentlemen had an altercation to which you cannot be absolutely sure who really did throw the first punch; is that true?
 {¶ 31} "A. Yes, and they'd been — they were — had been having altercations a long time before they showed up at my apartment." (Tr., pp. 39-40.)
 {¶ 32} Appellant testified in his own defense. He explained that he was temporarily living at Scott Rudder's apartment on the night of December 27, 2005, and that he had gone to sleep at about 11 p.m. since he had to go to work the next morning. Appellant said that he was not romantically involved with Mary Booth, but that she was interested in having a relationship with him. He and Mary would often talk and Daniel Brookes was convinced that she was cheating on him. (Tr., pp. 44, 45-46.)
 {¶ 33} On the night in question, Daniel repeatedly entered the room where Appellant was sleeping stating that Mary wanted to talk with him. Appellant exited *Page 8 
the room to talk with her twice and then returned to bed. After the second time, Appellant says he locked the bedroom door. Thereafter, while Appellant did not hear anyone picking the lock on his door, he woke up to find Daniel in his room. Daniel tripped on Appellant's work boots that were on the floor and fell onto the bed in which Appellant was sleeping. Daniel then fled from the room. (Tr., pp. 47-48.)
 {¶ 34} Appellant says he got up, put on his pants and shoes and went to ask Daniel what his "problem" was. Daniel and the others were all drunk. At that point, Appellant claims Daniel started to get up and he had his arm "cocked," "and that's when I hit him." (Tr., p. 49.) Appellant admitted hitting Daniel about four times. He recalls Daniel swinging back at him, but testified that he never made contact. (Tr., pp. 49-50.)
 {¶ 35} Based on the evidence presented at trial, it appears that Appellant's assault conviction was supported by sufficient evidence. He knowingly struck Daniel with his fists several times, causing injury. Reasonable minds could certainly agree with the decision rendered by the trier of fact in this case.
 {¶ 36} Further, Appellant's assault conviction was not against the manifest weight of the evidence. Although Appellant testified that it appeared Daniel was posturing to fight, it is also evident that Appellant repeatedly struck Daniel with knowledge that he was likely to cause injury. Scott's testimony that it "sounded like" Daniel had struck Appellant first was inconsistent with both Daniel and Appellant's testimony. The trial court judge, as the trier of fact, evidently believed Daniel's testimony over the others. Again, Daniel denied raising his hands toward Appellant, *Page 9 
and Appellant admitted that Daniel never made contact with him. As such, it does not seem that a manifest miscarriage of justice has occurred in this case warranting reversal. Appellant's first and second assignments of error lack merit and are overruled.
 {¶ 37} In Appellant's third and final assignment of error on appeal he asserts:
 {¶ 38} "THE TRIAL COURT ERRED IN NOT FINDING THAT DEFENDANT-APPELLANT ACTED IN SELF-DEFENSE."
 {¶ 39} Self defense, as an affirmative defense, does not negate an element of the charge. Instead, the defendant seeks to be relieved from culpability by attempting to justify his actions. State v. Martin
(1986), 21 Ohio St.3d 91, 94, 488 N.E.2d 166.
 {¶ 40} To establish the affirmative defense of self defense, a defendant must prove three elements by a preponderance of the evidence. First, that he was not at fault in creating the violent situation. Second, that he believed he was in imminent danger of bodily harm and that his only means of escape was the use of force. Lastly, a defendant must establish that he did not breach a duty to retreat or avoid the danger. State v. Williford (1990), 49 Ohio St.3d 247, 249,551 N.E.2d 1279, citing State v. Robbins (1979), 58 Ohio St.2d 74, 388 N.E.2d 755, paragraph two of the syllabus. It has also been held that there is no duty to retreat from one's own home. State v. Thomas (1997),77 Ohio St.3d 323, 673 N.E.2d 1339, syllabus. Further, a person claiming the right to self defense may use only the force reasonably necessary to prevent an attack. Williford, supra. *Page 10 
 {¶ 41} As Appellant points out, he may have not created the situation that gave rise to this altercation. It appears that Appellant was, in fact, provoked. If the trier of fact believed Appellant and Daniel, then Appellant was asleep in Scott's bedroom on the night in question when Daniel repeatedly entered the room. Appellant claims he had reason to believe he was in danger since Daniel had been aggressive in disturbing him all night. Nonetheless, there is nothing in the record indicating that Daniel was aggressive. Appellant testified that the last time Daniel entered the bedroom, Appellant got dressed and exited the room to investigate the source of his "problem." It was only at this point that Daniel allegedly, "started to get up and he had his arm cocked" as if he was posturing to fight Appellant. (Tr., p. 49.)
 {¶ 42} Also, there was no direct evidence that Daniel struck or even tried to swing first at Appellant. Although Scott speculated that he might have heard Daniel strike Appellant first, both Appellant and Daniel testified to the contrary. The evidence reveals that Daniel was agitating Appellant, but it does not establish that Daniel created the violent nature of the situation. Appellant exited the room and confronted Daniel. Only Appellant described Daniel's alleged aggressive posture. The trial court may have concluded from the evidence before it that Appellant did not satisfy the first element of his affirmative defense.
 {¶ 43} Secondly, Appellant failed to establish that he was in imminent danger of bodily harm and that his only means of escape was by the use of force. Assuming the trial court judge believed Appellant's testimony, the fact that Daniel appeared that he may have been ready to strike did not establish that Appellant was in imminent *Page 11 
danger of bodily harm or that Appellant was unable to leave the room and avoid a physical altercation. Appellant never testified that he feared great bodily harm.
 {¶ 44} Finally, upon Daniel's alleged assumption of a fighting posture, Appellant proceeded to strike him repeatedly and with a great deal of force. (Tr., p. 29.) Appellant admitted hitting Daniel four times, and Daniel said it may have been up to 20 times. It appears that Appellant used more than the force necessary even if we believe it occurred only to meet Daniel's aggressive posturing.
 {¶ 45} For the preceding reasons, we cannot find that Appellant was entitled to the affirmative defense of self defense. His third assignment of error lacks merit.
 {¶ 46} As all of Appellant's assignments of error on appeal lack merit, they are overruled. The trial court's decision is affirmed in full.
Donofrio, J., concurs.
 Vukovich, J., concurs. *Page 1