[Cite as *State v. Ray*, 2013-Ohio-3671.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


STATE OF OHIO,                                  :

    Plaintiff-Appellee,                      :                CASE NO.  CA2012-10-213

                                              :                O P I N I O N
  - vs -                                                            8/26/2013
                                              :

MICHAEL JACOB RAY,                             :

    Defendant-Appellant.                     :


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2012-06-0941


Michael T. Gmoser, Butler County Prosecuting Attorney, Kimberly L. McManus, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Fred S. Miller, 246 High Street, Hamilton, Ohio 45011, for defendant-appellant

F. Joseph Schiavone, 6 South Second Street, Suite 520, Hamilton, Ohio 45011, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Michael Jacob Ray, appeals his conviction in the Butler County Court of Common Pleas for the murder of his stepfather. For the reasons discussed below, we affirm appellant's conviction.

{¶ 2} On Father's Day, June 17, 2012, appellant's stepfather, Brian Schmidt, his mother, Bonnie Schmidt, and his two younger siblings left their home on Weeping Willow Drive in St. Clair Township, Butler County, Ohio to attend a baseball game. Appellant, age 18 and residing at his parent's home, did not attend the baseball game. Rather, appellant stayed home, drank a wine cooler and two beers, and watched movies with his friend and neighbor, David. David eventually left the residence, and sometime thereafter, appellant's family returned home.

{¶ 3} When appellant's family arrived at their residence, Brian was in a bad mood as the family had been arguing about where to go out to eat for Father's Day. Upon entering the home, Brian and Bonnie immediately noticed the missing alcohol and confronted appellant. Appellant denied knowing what happened to the alcohol, but admitted that David, who Bonnie and Brian did not like, had been over. Angry, Brian stated that he was "going to go kick David's ass," and he left the home to walk to David's house. After Brian left, appellant admitted to his mother that he had consumed the alcohol, and Bonnie sent her younger son to bring Brian back to the house.

{¶ 4} Once Brian returned, he entered appellant's bedroom to discuss appellant's underage drinking. Bonnie was present during this confrontation. Brian scolded appellant, telling him that an 18 year old should not be drinking. Appellant made a "smart" remark to Brian in response, commenting that he was not the one who had a DUI, so he did not see how Brian could tell him not to drink. Appellant's "smart" comment further angered Brian, and Brian, who was approximately 71 inches tall and weighed 215 pounds, chest bumped appellant back against the wall of appellant's bedroom without using his hands. Brian "got in appellant's face," saying "You want to get froggy, little man? Are you going to hit me?" Appellant, who weighed 130 pounds, moved off the wall, put his hands on Brian's chest, and pushed Brian backwards. Brian then grabbed appellant and shoved him back "hard" against

- 2 -

the side of appellant's dresser. The two men continued to argue with one another, shouting and yelling back and forth. At this time, Bonnie left the room briefly to tell her younger son, who had been walking towards appellant's bedroom, to go back to his own room.

{¶ 5} According to appellant, Brian and appellant's argument escalated when Brian began to repeatedly punch and hit him over the head. Brian's first punch to appellant's head caused appellant's glasses to fall off and break. After the first punch, appellant stated he put his head down and his hands up to ward off the blows. Appellant claimed that when Brian was striking him, he felt something metal hitting his head. Appellant thought the metal item was Brian's ring, but he was not positive as he was looking down during the assault. Appellant stated that Brian made contact with his head at least "four or five" times, and during that time appellant could not "think clearly" and he "started losing vision." Appellant claimed he began to panic and "freak out" so he reached behind himself and found a 5.25 inch long, unsheathed hunting knife that he had on top of his dresser. Appellant grabbed the knife by the handle, and without looking, "lunged" at Brian with the knife. Appellant stabbed Brian at a downward angle one time in what he thought was the chest area. Appellant stated that his intention in stabbing Brian was to get Brian off of him, but he did not want to hurt Brian. At the time he grabbed the knife, appellant claimed, "I was in fear for my safety. I thought [Brian] was going to do me great bodily harm, so I grabbed the knife to try to stop [Brian] from doing bodily harm."

{¶ 6} Appellant claimed that once he felt the knife enter Brian, he stopped and pulled it out. According to appellant, Brian continued to try and hit appellant a few more times before leaving appellant's room. Once Brian left appellant's bedroom, he collapsed in the kitchen and appellant yelled for his mother to call 9-1-1.

{¶ 7} Sometime during the altercation, Bonnie returned to appellant's bedroom. At this time, she saw Brian hitting appellant "over and over," she heard Brian say something

about a knife, and she saw blood.  However, she was unsure whether Brian was stabbed before he hit appellant or after he hit appellant.  Bonnie had tried to break up the fight, but she could not get between her husband and son, so she left the room to call 9-1-1.  After leaving the room, Bonnie heard appellant yell, "Mom, call 911," and at 4:41 p.m., Bonnie called for emergency assistance.

{¶ 8}  Dispatcher Debbie Rednauer answered the call and was informed that the caller's husband was hurt and not breathing.  Rednauer dispatched emergency personnel to the Schmidt's home.  After the first call was abruptly ended, Rednauer placed a return call to the telephone number which made the original 9-1-1 call, but this call was not answered.  Rednauer placed another return call, and this time, appellant answered the call.  Appellant told Rednauer, "I'm a murderer.  You need to arrest me.  * * *  I was caught drinking my dad's alcohol.  I wasn't drunk, I just drunk a few of his beers.  He came in and got mad and I just snapped.  I stabbed him.  * * *  I'm willing to confess."

{¶ 9}  Emergency personnel from the Butler County Sheriff's Office responded to the scene while appellant was on the phone with Rednauer.  Deputies Hansford Spivey and Aaron Sorrell were the first to arrive at the scene.  When they arrived at the residence, they found Brian lying in a large pool of blood in the kitchen, Bonnie lying on top of him screaming for help, and appellant "dripping in blood."

{¶ 10}  Appellant was placed in handcuffs and escorted out of the home.  Bonnie was removed from the kitchen and placed in the living room so that emergency personnel could perform CPR on Brian.  At this time, Bonnie noticed that she was holding a metal multi-tool that she had pulled from Brian's hand after he had fallen to the floor in the kitchen.  Bonnie claimed to have given the multi-tool to an officer, but officers who later processed the scene stated that they came across the multi-tool by observing it on the coffee table in the living room.  The multi-tool appeared to have blood on it.

{¶ 11} Brian was pronounced dead at the scene. Deputies from the Butler County Sheriff's Office collected evidence from the residence, including the knife appellant used to stab Brian. The knife had been located on the floor of appellant's bedroom.

{¶ 12} Appellant was taken to the Butler County Sheriff's Office, and, upon his arrival, Detective Jason Rosser took photographs of appellant. Other than a small scratch on appellant's face, Rosser did not see any visible injuries to appellant, nor did appellant complain to Rosser that he was injured. Rosser did observe blood on the back of appellant's neck, but he was unsure of whose blood it was as appellant arrived at the sheriff's office with large amounts of blood covering his arms and face. Rosser also noticed and photographed a mark running across appellant's back. Rosser did not believe this mark was from an injury, but rather believed the mark was created from a chair appellant had been sitting against. A photograph of the top of appellant's head was also taken, depicting a small cut.

{¶ 13} After appellant was photographed, he was placed in an interview room by himself. This room was equipped with an audio and video recording system, which was activated by an officer. While alone in the interview room, appellant began talking to himself, saying, "You killed an innocent man. * * * He wasn't going to hurt you. You fucking stab everyone that frustrates you, Michael? Crazy * * * bastard."

{¶ 14} Appellant's mother was also taken to the sheriff's office. Bonnie made a statement to detectives that she saw "Brian * * * bleeding and then [she] saw Brian hitting [her] son and tried to get a knife away from him." Bonnie then commented to detectives that "my husband is gone and I have to think of my family now." When Bonnie asked to speak with her father, she and her father were placed in an interview room where their conversation was recorded. When speaking with her father, Bonnie told him that she did not see Brian hitting appellant, that "Michael pulled out a knife first," and "[t]hat's why [she] didn't want to talk." However, Bonnie later explained that she had only made these statements to her

father because she did not want to say anything bad about her husband.  She stated, "My husband had just died, basically in my arms, and I didn't want to sit there and tell my dad anything bad about my husband, that he hit my child.  I didn't want my dad to think bad of my husband while he was dead."

{¶ 15} On June 18, 2012, an autopsy was performed by Dr. James Swinehart, a forensic pathologist and Butler County Deputy Coroner, who determined that Brian died from a single stab wound on the right side of his body.  According to Dr. Swinehart, the stab wound was in the supraclavicular region, located just above the collarbone or clavicle, and the wound transected two major vessels, the subclavian artery and subclavian vein.  The incision to the subclavian artery and subclavian vein allowed "a good deal of blood" to escape, and Dr. Swinehart explained that it only took minutes for Brian to die as a result of the wound.  Dr. Swinehart noted that he did not find any defensive wounds on Brian's body during his examination and that he normally sees bruising or wounds, at least on the forearms and hands, of a body when a person has been engaged in mutual hand-to-hand combat.

{¶ 16}  Appellant was indicted on one count of murder in violation of R.C. 2903.02(B). The matter proceeded to a jury trial in October 2012 where appellant presented evidence that he acted in self-defense.  Appellant testified that he suffered a long history of verbal abuse by his stepfather, who had a "bad temper."  Appellant remembered only one instance where Brian had been physically abusive, which occurred when appellant was about six years old. Appellant recalled that Brian had picked him up and thrown him across the room.

{¶ 17} Appellant testified that, on the day of Brian's death, he had grabbed the knife and used it against Brian because he did not think he was able to defend himself without the knife, given that Brian was so much bigger than he was, Brian had backed him into the corner between his dresser and wall, and there was no place for appellant to go to get away

from the assault. Appellant testified that he did not want to hurt Brian when he stabbed him, but he "just wanted [Brian] to stop. [He] couldn't control [Brian] with [his] hands. There was no way."

{¶ 18} Appellant admitted that he told the 9-1-1 dispatcher that he was a murderer and that he had commented to himself in the interview room that he had killed an innocent man who was not going to hurt him. Appellant explained that what he meant by an "innocent man" was that "[Brian] did not deserve to die." He further explained that, "[l]ooking back on it, I - - I don't think he - - right now I don't think [Brian] was going to hurt me, but at the time when I'm getting punched in the head, it's hard to come to that conclusion. * * * Looking back on it, I don't - - I honestly don't think he would have seriously hurt me."

{¶ 19} The jury ultimately rejected appellant's claim of self-defense and found appellant guilty of murder. Appellant was sentenced to serve 15 years to life in prison. Appellant timely appealed his conviction, setting forth a single assignment of error.[1]

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT DID NOT PROPERLY INSTRUCT THE JURY REGARDING THE LACK OF A DUTY TO RETREAT FROM HIS RESIDENCE.

{¶ 22} In his sole assignment of error, appellant argues the trial court erred in instructing the jury on self-defense. Specifically, appellant asserts that the trial court erred when it chose not to replace its duty to retreat instruction with appellant's proposed instruction that "there is no duty to retreat from one's home." Appellant contends that "[w]hen a defendant is facing a deadly attack in his own home and kills his assailant in self-defense,

---

1. Appellant's brief originally set forth two assignments of error. In his second assignment of error, appellant argued that the trial court erred by failing to provide a jury instruction for voluntary manslaughter. However, on August 8, 2013, appellant voluntarily withdrew his second assignment of error from this court's consideration.

the court must instruct the jury that the defendant has no duty to retreat from his own home, even though the assailant was a co-occupant of the home." In support of his position, appellant relies on both common-law principles and R.C. 2901.09, which states in relevant part, "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense." The state, on the other hand, contends that the trial court did not err as it provided the jury with complete and correct statements of the law regarding appellant's duty to retreat.

{¶ 23} Prior to the jury being instructed on appellant's affirmative defense of self-defense, appellant objected to the trial court's proposed instruction regarding the duty to retreat. Appellant requested that the trial court instruct the jury that there is no duty to retreat from one's own home and, in support of his request, cited *State v. Ward*, 168 Ohio App.3d 701, 2006-Ohio-4847 (4th Dist.). The trial court denied appellant's request after the following discussion was held:

> THE COURT: Doesn't that [*State v. Ward*] have to deal with where there is an intruder into the house as opposed to where two people are residents of the house? I believe that's my recollection of the case.
>
> [APPELLANT'S COUNSEL]: Judge, I think it does, but I don't know that I've seen any case law that states just because one or the other persons involved in the altercation is also a member of the home, then that places a higher burden on the person trying to claim the affirmative offense or affirmative defense.
>
> THE COURT: Well, I think the defense of your house in that, I think that was the cases that have arisen or does a person have a duty to retreat if somebody comes into his house, and I think that it's, you know, it's very much tied into that concept, that if you're in your home and somebody comes into your home, whether they be an intruder or an invited guest, and you get into an altercation, that that duty to retreat out of your house isn't - - is you don't have that duty to retreat, but when you have this situation, whether or not there was or was not a duty to retreat, I think, again, it's a question of fact that the jury has to decide.

I'm not saying that your client has a duty to retreat, because I tell them, I tell the jury, the defendant does not have - - no longer has a duty to retreat if, and then I give them, you know, when that duty to retreat goes away. So it's not as if I'm saying to the jury that he has a duty to retreat, because I said a duty to retreat, the defendant has no longer a duty to retreat if you meet the three circumstances or conditions set forth in the law.

So I'm not saying that he has a duty or he doesn't have a duty. I'm saying you normally have a duty, but that duty can go away under right circumstances. So I think I'm reading the law correctly.

{¶ 24} The trial court then provided the following self-defense instruction to the jury:

Now, the defendant is asserting an affirmative defense known as self-defense. The burden of going forward with the evidence of self-defense and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence. Preponderance of the evidence is the greater weight of the evidence. That is evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it.

\* \* \*

To establish a claim of self-defense, the defendant must prove by the greater weight of the evidence that he was not at fault in creating the situation giving rise to the death of Brian Schmidt, and that he had a reasonable - - reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent or immediate danger of death or great bodily harm, and that his only reasonable means of escape from such danger was by the use of deadly force, and he had not violated any duty to retreat to avoid the danger. The defendant has a duty to retreat if he was at fault in creating the situation giving rise to the assault or if he did not have reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, or that he had a reasonable means of escape from that danger other than by use of deadly force.

The defendant no longer has a duty to retreat if first, he retreated from the situation and no longer participated in it; and second, he then had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm; and three, the only reasonable means of escape from the danger was by the use of deadly force even though he was mistaken as to the existence of that danger.

{¶ 25} "Jury instructions are matters left to the sound discretion of the trial court." *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 39. "In reviewing a trial court's decision on jury instructions, an appellate court's role is to ascertain whether the trial court abused its discretion in refusing to give a proposed instruction, and, if so, whether that refusal was prejudicial." *State v. Campbell*, 12th Dist. Butler No. CA2009-08-208, 2010-Ohio-1940, ¶ 12, citing *State v. McLavin*, 12th Dist. Fayette No. CA2006-11-044, 2007-Ohio-5633, ¶ 17. For this court to find an abuse of discretion we must find more than an error of judgment; we must find that the trial court's ruling was unreasonable, arbitrary, or unconscionable. *State v. Brown*, 12th Dist. Butler No. CA2011-11-207, 2013-Ohio-1610, ¶ 23.

{¶ 26} To establish the affirmative defense of self-defense, a defendant must prove by a preponderance the following three elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). However, "there is no duty to retreat when one is assaulted in one's own home." *State v. Thomas*, 77 Ohio St.3d 323, 327 (1997). "[A] person who, through no fault of [his] own, is assaulted in [his] home may stand [his] ground, meet force with force, and if necessary, kill [his] assailant, without any duty to retreat." *Id.* There is "no distinction between cases in which the assailant has a right equal to the defendant's to inhabit the residence and cases in which the assailant is an intruder." *Id.* As there exists "no rational reason for a distinction between an intruder and a cohabitant when considering the policy for preserving human life where the setting is the domicile," the Supreme Court has held that "there is no duty to

retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." *Id.* at 328.

{¶ 27} In the present case, once the trial court determined that a self-defense jury instruction was warranted, the court was obligated to give an accurate and complete instruction on the defense. *State v. Carreiro*, 12th Dist. Butler No. CA2011-12-236, 2013-Ohio-1103, ¶ 14, citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; *State v. Williford*, 49 Ohio St.3d 247, 251 (1990) ("[a] criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence"). Here, the trial court did not provide a complete statement of the law to the jury as the court failed to instruct the jury that appellant had no duty to retreat from his own home. *See Thomas* at 327-328; s*ee, e.g., Ohio Jury Instructions*, CR Section 421.19(4)(B) (Rev. Aug. 15, 2012) ("If the defendant was assaulted in his home * * * the defendant had no duty to retreat and could use such means as are necessary to repel the assailant from the home."). Accordingly, we find that the trial court's denial of appellant's requested "no duty to retreat" jury instruction was unreasonable and arbitrary, and, therefore, an abuse of its discretion.

{¶ 28} Given that the trial court abused its discretion by failing to instruct the jury that appellant did not have a duty to retreat from his own home, the issue then becomes whether appellant was prejudiced by such an omission. "[A] reviewing court may not reverse a conviction in a criminal case due to jury instructions unless 'it is clear that the jury instructions constituted prejudicial error.'" *Campbell*, 2010-Ohio-1940 at ¶ 13, quoting *State v. Brown*, 12th Dist. Clinton No. CA2008-12-049, 2009-Ohio-3933, ¶ 6. In order to determine whether an erroneous jury instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Partin*, 12th Dist. Butler No. CA2012-09-189, 2013-Ohio-2858, ¶ 32, citing *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶

36. "A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice." *Id.*; *Campbell* at ¶ 13. Conversely, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A).

{¶ 29} Our review of the record convinces us that the omission of the "no duty to retreat from one's own home" instruction was not a prejudicial error requiring reversal under the facts of this case. As made clear by the Supreme Court of Ohio, "the elements of self-defense are cumulative. In order to prevail on the issue of self-defense, the accused must show that he was not at fault in starting the affray, *and* that he had a bona fide belief that he faced imminent danger of death or great bodily harm and that his only means of escape was the use of such force, *and* that he violated no duty to retreat or avoid the danger." (Emphasis sic.) *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986). The failure to prove any one of these elements is fatal to a defendant's claim of self-defense. *Id.*

{¶ 30} In the case sub judice, the evidence reveals that appellant did not have a bona fide belief that he faced imminent danger of death or great bodily harm from Brian. This element of self-defense, "the second element," is a combined subjective and objective test. *Thomas,* 77 Ohio St.3d at 330. "[T]he jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack [he] *reasonably* believed [he] was in imminent danger." (Emphasis sic.) *Id.* "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger." (Emphasis sic.) *Id.* at 331. "Another component contained within the second element is the defendant's bona fide belief that the use of force was the only means of escape. Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack.'" *State v. Bundy*, 4th Dist. Pike No. 11CA818, 2012-Ohio-3934, ¶ 55, quoting *State v. Hendrickson*, 4th

Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 23. *See also Williford*, 49 Ohio St.3d at 249;

*State v. Rice*, 12th Dist. Butler No. CA2003-01-015, 2004-Ohio-697, ¶ 25.

{¶ 31} Although Brian was physically larger than appellant, there was no indication that a reasonable person in appellant's situation, or that appellant himself honestly believed, that appellant was in imminent danger of death or great bodily harm. The jury heard testimony that, other than one incident that occurred 12 years ago, there was no history of Brian ever assaulting appellant or causing him serious harm. Rather, appellant described Brian as someone with a bad temper whose typical behavior towards appellant included "get[ing] in [appellant's] face, * * * yell[ing] at [appellant], * * * threaten[ing] [appellant]" and "push[ing] [appellant]." According to appellant, Brian engaged in such behavior "all the time." The fact that this altercation with appellant escalated to four or five blows to appellant's head did not mean that appellant was in imminent danger of death or serious bodily harm. In fact, although appellant testified he was panicking and "freaking out," appellant acknowledged to himself that Brian "wasn't going to hurt [him]." Significantly, during the 9-1-1 call that occurred within minutes after appellant stabbed Brian, appellant did not indicate that he had acted in self-defense or out of fear. Rather, appellant admitted to "snapping" after Brian got mad at him for drinking alcohol. Given appellant's behavior and statements, the only available evidence to the jury demonstrated that appellant had no bona fide belief that he was in imminent danger of death or great bodily harm.

{¶ 32} Moreover, the evidence adduced at trial demonstrates that appellant used excessive force in stabbing Brian. Appellant was punched "four or five" times in the head, which resulted in minimal physical injury to appellant as he only sustained a scratch to his face, a small cut on top of his head, and a possible "mark" or bruise to his back. However, even if we ignore appellant's rather minor injuries and take as true appellant's version of events, we find that appellant failed to demonstrate that the force reasonably necessary to

repel Brian's attack required the use of lethal force in stabbing Brian in the supraclavicular region with a hunting knife. Appellant used deadly force when he was not faced with deadly force, only fists. *See State v. Baker*, 12th Dist. Butler No. CA2007-06-152, 2008-Ohio-4426, ¶ 36 (Where the victim punched the defendant two or three times before the defendant struck the victim in the head with a hammer, this court found that "even if [the defendant's] version of events [was] believed, [the defendant] failed to demonstrate that the force reasonably necessary to repel [the victim's] attack required the potentially lethal act of hitting [the victim] in the head with a 16-ounce claw hammer. It is clear that [the defendant] used deadly force when he was not faced with deadly force, only fists."). Appellant could not prove one of the essential elements to his claim of self-defense. He, therefore, cannot show prejudice from the trial court's omission of the "no duty to retreat from one's own home" instruction.

**{¶ 33}** Accordingly, we conclude that although an instruction from the trial court stating that appellant did not have a duty to retreat from his own home would have been appropriate in this case, the trial court's failure to give such an instruction was not prejudicial as it did not affect appellant's substantial rights. *See* Crim.R. 52(A); *Jackson*, 22 Ohio St.3d at 285.

**{¶ 34}** Appellant's sole assignment of error is, therefore, overruled.

**{¶ 35}** Judgment affirmed.

S. POWELL and RINGLAND, JJ., concur.