[Cite as *State v. Morris*, 2024-Ohio-2960.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

DEMARCO B. MORRIS,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-24

O P I N I O N

Appeal from Allen County Common Pleas Court
Trial Court No. CR2021 0317

**Judgment Affirmed**

**Date of Decision: August 5, 2024**

APPEARANCES:

    *Chima R. Ekeh* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**ZMUDA, J.**

{¶1} Defendant-appellant, Demarco Morris ("Morris"), brings this appeal from the April 18, 2023, judgment of the Allen County Common Pleas Court sentencing him to prison after a jury found him guilty of one count of murder, two counts of felonious assault, and one count of discharge of a firearm on or near prohibited premises. On appeal, Morris argues that his convictions were against the manifest weight of the evidence, that the trial court erred by permitting extrinsic evidence of a witness's prior inconsistent statement without a limiting instruction, and that the Reagan Tokes Law is unconstitutional. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} On September 5, 2021, Morris fired three shots at a truck being driven by Davion Latson ("Davion"). One of the bullets struck Davion in the back and killed him. As a result of his actions, Morris was indicted for murder in violation of R.C. 2903.02(A), an unclassified felony, murder in violation of R.C. 2903.02(B), an unclassified felony, two counts of felonious assault in violation of R.C. 2903.11(A)(2), both second degree felonies, and discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a first degree felony. All charges contained three-year firearm specifications pursuant to R.C. 2941.145(A).

{¶3} Morris pled not guilty to the charges and filed a notice of self-defense. He proceeded to a jury trial, which was held March 20-24, 2023.

Evidence Presented

**{¶4}** The issues raised in the first and second assignments of error require a detailed analysis of the evidence presented at trial.

**{¶5}** On Sunday September 5, 2021, Michael Latson ("Latson") left his residence with his friend Lemonda Pryor ("Lemonda"). Throughout the afternoon and evening, Latson, Lemonda, and others consumed alcoholic beverages at various residences in Lima. By all accounts, Latson was irritating some of the people he was around by talking "down" to them or making threats. (Tr. at 752, 436, 414).

**{¶6}** Later in the evening, Latson, Lemonda, Morris, and a man named Larry went to the liquor store to get more alcohol. While at the store, Latson got into a verbal argument with Larry. Despite the argument, Latson returned with the others to Larry's residence at 168 South Perry Street in Lima.

**{¶7}** At Larry's residence, numerous people were hanging out in the front yard, including Latson, Lemonda, Larry, Larry's live-in girlfriend Melody, Morris and three of Morris's children. While at the house, Latson again got into an argument with Larry. This time, Morris, who was nearby and overheard Latson, punched Latson in the face. Latson went to the ground and was dazed. Lemonda eventually helped him up.

**{¶8}** Multiple officers from the Lima Police Department came to the residence and inquired about a fight, but the officers were assured everything was

fine, so they left. After the police were gone, Latson walked away from the residence because, *inter alia*, he did not have another way to get home.

{¶9} Latson's girlfriend called him while he was lost and walking around Lima. She described him as confused and disoriented. Latson did not know where he was, so his girlfriend told him to go to the nearest house with a porch light on and ask the location. Latson did so, and told his girlfriend where he was located. Because Latson's girlfriend did not have a vehicle, she called her son, Davion, to pick-up Latson.

{¶10} Davion arrived promptly in his truck and Latson got into the vehicle. Davion asked Latson who had hurt him and Latson said that he did not know, but he was with Lemonda. Latson's girlfriend remained on the phone and could hear the conversation. Davion drove Latson toward the hospital, which took him past Larry's residence. People were still outside, and Latson indicated that the residence was where he had been punched. Davion did a U-turn and returned to the residence, stopping in the road. He began to yell out the window to inquire who had hurt his father, but as he was yelling, Morris fired three shots at the truck. As the bullets were being fired, Davion started to pull away. However, one of the bullets went through the truck and struck Davion in the back. Latson's girlfriend was still on the phone and overheard what transpired.

{¶11} Davion told his father that he thought he had been "hit." (Tr. at 237). Davion slumped over the steering wheel and his foot pressed on the gas. Latson

tried to stop the truck but was unable to do so before the truck crashed and flipped upside down. By the time law enforcement officers arrived at the scene of the crash, Davion was deceased and Latson suffered numerous injuries.

{¶12} Law enforcement officers responded to the area of the shooting and secured the residence at 168 South Perry. Morris was not at the residence when police arrived; however, he was located several hours after the shooting, coming out of a shed that was behind a residence next door to where the shooting occurred.

{¶13} Several people who were present during the shooting spoke with the police and ultimately testified at trial. Larry's girlfriend Melody, who also lived at 168 South Perry in Lima, testified that she had asked Latson to leave the residence earlier in the night because she heard Latson threaten Larry.

{¶14} As to the shooting, Melody testified that she saw the truck Davion and Latson were in go past her residence, then make a U-turn. Melody did not know who was driving the truck when the truck stopped in front of the house and the driver started shouting. Melody testified that Morris started shooting and the truck drove away. Melody testified she did not see the driver of the truck get out of the vehicle and that she did not see him with a gun. Melody testified that she saw Morris hand the gun he used to shoot at the truck to a younger male. The younger male took the gun and hid it under a mattress in the house, which was later located when police searched the residence.

{¶15} Zander H. was present at the time of the shooting and his testimony was consistent with Melody's. He testified he saw the truck pass the residence, then turn back. He observed two people in the truck cab. Zander testified that he did not see the driver have a gun but he did hear the driver yelling through the window. Zander testified that the driver started pulling away as shots were fired.

{¶16} Lemonda testified at trial as well. He detailed the day he had spent with Latson and the events that preceded the shooting. Lemonda testified that Latson was irritating people throughout the evening and that he helped Latson off the ground after Morris punched him. Lemonda testified that when Latson left, Lemonda told Morris and others that the matter was not over, that Latson would be back. However, Lemonda testified that he never said anything about guns.

{¶17} Lemonda testified that when the truck pulled up, he did not know who was driving it, despite knowing Davion since Davion was young. He testified that he did not see Davion with a gun. However, Lemonda testified that the way Davion stopped in the street, Lemonda thought he had a gun. Further, Lemonda was the only witness who testified that Davion got out of the truck. Lemonda was adamant at trial that Davion was coming toward the people at the residence.

{¶18} Morris testified at trial and acknowledged that he shot at the truck, but he claimed he did so in self-defense, and without the intention of striking the driver. Morris testified that his children were playing in the front yard and he saw the driver

stop abruptly with a gun in his right hand, yelling things, so he shot at the driver to protect his children.

{¶19} Morris claimed that earlier in the night when he knocked Latson down, he saw a gun on the ground that he presumed to be Latson's. Notably, the other witnesses who were present and testified did not see a gun on the ground or see Latson have a gun at all that day. Morris also claimed that he took the firearm he thought was Latson's, so Latson did not leave with the gun.

{¶20} The autopsy of Davion established that he died as a result of a gunshot wound to the back. Davion's back had abrasions that were consistent with a bullet passing through the vehicle before striking him, and bullet trajectory rods further indicated Davion was in the vehicle when he was shot.

{¶21} Importantly, contrary to Morris's testimony, no firearm was located in Davion's crashed truck, near the crash site, or between the residence where the shooting occurred and the crash site. No witness, other than Morris himself, testified that Davion had a firearm. Finally, Morris was overheard on the night of the incident stating, "It wouldn't be my first body." (State's Ex. 4); (Tr. at 348).

Conviction and Sentencing

{¶22} Morris requested, and received, a jury instruction on self-defense. Ultimately, Morris was acquitted of the purposeful murder charge; however, he was convicted of all remaining charges and specifications. On April 18, 2023, Morris

was sentenced to serve an indefinite prison term of 30-33 years to life in prison.[1] A judgment entry memorializing his sentence was filed that same day. It is from this judgment that Morris appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**Appellant's convictions are against the manifest weight of the evidence.**

**Second Assignment of Error**

**The trial court erred by allowing the state to present extrinsic evidence of Lemonda Pryor's prior inconsistent statements and without a limiting instruction.**

**Third Assignment of Error**

**R.C. 2967.271 (The Reagan Tokes Law) violated Appellant's right to a jury trial, the separation of powers doctrine, and his right to due process.**

*First Assignment of Error*

{¶23} In his first assignment of error, Morris argues that his convictions were against the manifest weight of the evidence. More specifically, he argues that the State failed to establish beyond a reasonable doubt that he was not acting in self-defense.

---

[1] The trial court merged the charges of murder, felonious assault of Davion, and discharge of a firearm on or near prohibited premises for purposes of sentencing. The State elected to proceed to sentencing on the murder charge.

Standard of Review

**{¶24}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 1997-Ohio-52. In doing so, this court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶25}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

Legal Standard Governing Self-Defense

**{¶26}** Under Ohio law, a person is permitted to act in self-defense. *See State v. Wilson*, 2024-Ohio-776. Revised Code 2901.05(B)(1) describes the process of raising this affirmative defense at trial and reads, in its relevant part, as follows:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-

defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

R.C. 2901.05(B)(1).

**{¶27}** Under R.C. 2901.05(B)(1) there are two burdens. *See State v. Grant*, 2023-Ohio-2720, ¶ 68 (3d Dist.). First, the defendant claiming self-defense has the burden of production. *State v. Palmer*, 2024-Ohio-539, ¶ 18. A defendant must produce evidence that "tends to support" his use of force in defending himself." *Grant* at ¶ 68. quoting *State v. Estelle*, 2021-Ohio-2636, ¶ 18 (3d Dist.). The Supreme Court of Ohio has held that the burden "is not a heavy one" and that it might be satisfied through the State's own evidence. *Palmer* at ¶ 20.

**{¶28}** If the defendant produces evidence that tends to support that he acted in self-defense, the burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use force in self-defense. *Wilson* at ¶ 16. Under this burden shifting framework, the State must disprove one of the following elements of self-defense beyond a reasonable doubt:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant has a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

(brackets and numbering in original) *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 2002-Ohio-68. Importantly, the elements of self-defense

are cumulative, and a defendant's claim of self-defense fails *if any one of the elements is not present*. *State v. Green*, 2023-Ohio-4360, ¶ 107 (3d Dist.).

{¶29} As to the first element, "[i]t is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. Canankamp*, 2023-Ohio-43, ¶ 38 (3d Dist.), quoting *State v. James*, 2021-Ohio-1112, ¶ 21 (2d Dist.).

{¶30} The second element of a self-defense claim is a combined subjective and objective test. *Grant*, *supra*, at ¶ 70. Thus, "self-defense 'is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" *State v. Thomas*, 1997-Ohio-269, quoting *State v. Sheets*, 115 Ohio St. 308, 310 (1926).

{¶31} "Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack." *State v. Ray*, 2013-Ohio-3671, ¶ 30 (12th Dist.), quoting *State v. Bundy*, 2012-Ohio-3934, ¶ 55 (4th Dist.). This "requires consideration of the force that was used in relation to the danger the accused believed he was in. * * * In both deadly and non-deadly force cases, '[i]f the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable.' " *State v. Lane*, 2023-Ohio-1305, ¶ 24 (6th Dist.), quoting *State v. Barker,* 2022-Ohio-3756, ¶ 27 (2d Dist.). Finally, as to the third element, "[a] person

has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B).

Analysis

**{¶32}** In order to establish beyond a reasonable doubt that Morris was not acting in self-defense when he shot and killed Davion, the state had to show that Morris was at fault in creating the situation or that Morris did not have a bona fide belief that he was in imminent danger.[2] *See Messenger*, *supra*, at ¶ 14. A reasonable jury could have concluded that Morris was at fault in creating the situation based on the evidence, *or* that Morris did not have a bona fide belief that he was in imminent danger. Establishing either one of these issues defeats Morris's self-defense claim. *State v. Green*, 2023-Ohio-4360, ¶ 107 (3d Dist.).

**{¶33}** As to being at fault in creating the situation, when Morris fired three shots at the truck Davion was driving, by his own admission, Morris did not know who was in the truck. The driver, Davion, only shouted out the window to ask who had hurt his father. The Supreme Court of Ohio has held that words alone are generally not sufficient provocation to incite the use of deadly force. *State v. Shane*, 63 Ohio St.3d 630, 637, 590 N.E.2d 272 (1992).

**{¶34}** Moreover, although Morris claimed he saw Davion with a firearm, all of the other witnesses who were present and testified at trial stated that they did not

---

[2] Although there was a third avenue the state could have pursued to prove that Morris was not acting in self-defense, that being that the defendant violated a duty to retreat, the state never contended that Morris violated a duty to retreat.

see Davion with a firearm. The jury was free to determine that Morris's claim was not credible, and that credibility determination is supported by the other witnesses' testimony and by the fact that no firearm was ever located in or around the truck. *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.) ("A self-defense claim is generally an issue of credibility."). Based on the evidence presented, the jury could have reasonably determined that Morris was at fault in creating the situation by shooting at a man he did not know, who was not brandishing a deadly weapon.

**{¶35}** Even if the jury did not determine that Morris was at fault for creating the situation, the jury could have reasonably determined that Morris was not in imminent danger and that the force he used was disproportionate to any perceived threat. Again, there is no indication that Davion had a firearm other than the bald assertions of Morris in his testimony. Multiple witnesses, who were still friends with Morris at the time of trial, testified that they did not see Davion with a firearm. A reasonable jury could determine that shooting at a person who has not displayed a firearm was disproportionate to the perceived threat. *State v. Moore*, 2023-Ohio-2864, ¶ 14 (9th Dist.) (holding a jury is free to conclude that defendant shooting unarmed victim was disproportionate to threat/not reasonably necessary under the circumstances). Here, the jury was specifically instructed on Morris's self-defense theory and the jury rejected it.

**{¶36}** In sum, the record supports the jury's determination in this matter that the state established beyond a reasonable doubt that Morris was not acting in self-

defense. *See State v. Messenger*, 2021-Ohio-2044, ¶ 49 (10th Dist.) (stating conviction is not against the manifest weight of the evidence where jury did not believe defendant's self-defense claim). At the very least, this is not one of the rare cases where the jury clearly lost its way or created a manifest miscarriage of justice. Therefore, Morris's first assignment of error is overruled.

*Second Assignment of Error*

{¶37} In his second assignment of error, Morris argues that the trial court erred by permitting improper impeachment testimony of Lemonda. In addition, he argues that the trial court erred by failing to provide an instruction to the jury that the impeachment evidence was limited for that purpose only.

Standard of Review

{¶38} Generally, the admission or exclusion of evidence lies within the trial court's sound discretion, and we will not reverse absent an abuse of discretion and material prejudice. *State v. Baskin*, 2019-Ohio-2071, ¶ 48 (3d Dist.), citing *State v. Conway*, 2006-Ohio-2815, ¶ 62. An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶39} When evidence is erroneously admitted over objection of the defendant, we review the matter to see if the error was harmless under Crim.R. 52(A). An error is harmless if it did not impact the substantial rights of the defendant. *State v. Morris*, 2014-Ohio-5052, ¶ 23.

**{¶40}** The decision of whether to give a jury instruction is also typically within the sound discretion of the trial court. *State v. Thompson*, 2017-Ohio-792, ¶ 11 (3d Dist.). However, where no objection was made to any failure to provide a jury instruction, the issue is waived absent plain error. *State v. Underwood*, 3 Ohio St.3d 12, (1983). Courts ordinarily should take notice of plain error "with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Gardner*, 2008-Ohio-2787, ¶ 78.

Analysis

**{¶41}** In order to address Morris's argument that the trial court permitted improper impeachment testimony of Lemonda Pryor, we must analyze the sequence of events and the testimony leading to the state introducing Lemonda's prior inconsistent statement. Pryor was called as a court witness in this case and he testified regarding the events of September 5, 2021. During the prosecution's questioning of Lemonda, he testified about the truck stopping in the road in front of the residence at 168 South Perry Street, then the following exchange occurred:

> Q. Okay. And at the time – well, I guess, after everything happened you spoke with Detective Stechschulte, is that correct?
>
> A. Yes.
>
> Q. Okay. And at that time you told Detective Stechschulte that someone had leaned out of the window and hollered something, is that right?
>
> A. I don't remember telling him he leaned out. I remember Davion getting out.

-15-

Q. Okay. So your testimony today is that Davion got out of the car?

A. Yes.

\* \* \*

Q. Okay. So it's your testimony Davion steps out of the car, is saying, "Which one of you—

A. Yeah.

Q. Okay. And then shots ring out?

A. Yeah.

\* \* \*

Q. Okay.
          And he's outside of the car?

A. Yeah. With the door open.

\* \* \*

Q. Okay. And, so, the shots ring out and Davion's outside of the truck?

A. Yeah.

Q. Walking towards 168 Perry?

A. Yeah. He was coming towards it. Yes.

Q. Okay. What happens next?

A. I just heard shots firing.

Q. Okay. So, the shots fire.

A. When – when he pulled upon the scene he literally stomp on the break [sic]. So, we already like, damn, who this is, so, we trying to

take cover, you know what I'm saying. All in the mix of him saying that he's getting out of the car saying, "which one of you * * *" then that's when I heard three shots.

Q. And then Davion gets back in the car and drives away?

A. Yes.

* * *

Q. Okay. And you said you don't remember telling Detective Stechschulte that Davion only leaned out of the car?

A. If I would have said it. I don't remember saying it like that. I remember telling him that he was coming at us.

Q. Okay.

A. If I would have said – I might have said he leaned out the car knowing that he was out of the car.

(Tr. at 356-359)

{¶42} Defense counsel also asked Lemonda about whether Davion had exited the truck before being shot in the following exchange:

Q. Okay. So, when the car or the truck stopped you did see Davion get out of the truck?

A. I didn't even know it was Davion at first.

Q. You saw some—

A. Yeah.

Q. I don't want to put words in your mouth. You saw someone get out of the truck?

A. Yes.

-17-

Case No. 1-23-24

(Tr. at 382).

**{¶43}** The next time Lemonda's statement was brought up was during Detective Stechschulte's direct examination. During that examination, the following exchange occurred, leading to an objection by defense counsel:

Q. Detective, did you also speak with a Lemonda Pryor?

A. Yeah, I spoke with Lemonda.

* * *

Q. Okay. And you were present for Lemonda's testimony yesterday?

A. Yes I was.

Q. And Lemonda testified that Davion Latson was outside of the car when Lemonda heard the shots, is that correct?

A. Yes.

Q. Okay. Is that consistent with what he told you during his interview?

A. Not at all.

Q. Okay. The interview with Mr. Pryor, was that audio and video recorded.

A. Yes, it was.

Q. Okay. If you were to view the portion of the interview – I guess, did you review your interview with Mr. Pryor before coming to court today?
A. Yes.

Q. And were you able to view the portion where Mr. Pryor explained to you just hours after the incident where Davion was at when he was shot?

-18-

A. Yes.

[Defense Counsel]: Your Honor, at this point I'm going to have to enter an objection. * * *

* * * [The trial court removes jury to speak with the attorneys about the matter.] * * *

THE COURT: All right. You may be seated.

Okay. For the record, you were wanting to play the interview with Lemonda Pryor, correct?

[Prosecutor]: Not the entire interview, Your Honor. I have –

THE COURT: No. I mean a portion of it.

[Prosecutor]: Correct. I have about an 18 second clip.

THE COURT: What did you have it marked as?

[Prosecutor]: I don't have it marked I was just going to use it as –

THE COURT: Oh, okay.

[Prosecutor]: For impeachment purposes, Your Honor.

THE COURT: Okay. All right. So, there's a question that exists about whether he was – he, being Lemonda Pryor – Was given the opportunity to admit or deny making the statement. If he admitted to making the statement in question then you don't get to prove it up because you have through him.

[Prosecutor]: Correct.

* * * [The trial court takes a recess so attorneys can listen to Lemonda's testimony, then reconvenes and allow the attorneys to argue the issue.] * * *

[Defense Counsel]: The objection would be that Mr. Pryor was not directly confronted with his prior statement, alleged statement, to Detective Stechschulte for him to either admit or deny. He says, "I

don't remember." So, my feeling is that he was not directly fronted [sic] by any prior inconsistent statement by the State of Ohio. And because of that they're not allowed at this point to try and show that he was inconsistent now when he couldn't even fair – full and fair, I think, a full and fair opportunity to admit or deny the specific statement he made.

* * *

THE COURT: Okay. Thank You. [Prosecutor]?

* * *

[Prosecutor]: In the recording that we just listened to of Lemonda Pryor's testimony during my direct examination. I asked him initially, I believe, you didn't tell Detective Stechschulte that speaking of Davion Latson getting out of the vehicle when you spoke with Detective. Something along those lines. And he said He didn't remember.

Then minutes later in the direct I kind of circled back and I, again, asked him. And I said something along the lines of, so you don't remember telling Detective Stechschulte that Davion was leaning out of the car. And that's the point where he said something along of, I don't remember. I remember him being in the car. I remember telling Detective Stechschulte he was leaning out of the car, he was in the car, something along those lines, Your Honor. Or, I'm sorry. I remember telling Detective Stechschulte he got out, meaning in the interview with Detective Stechschulte Lemonda had told Detective Stechschulte that Davion Latson got out of the car, which is the –

THE COURT: The words I have is he told Detective Stechschulte "He was coming at us."

[Prosecutor]: He was coming at us. Thank you, Your Honor. * * *
And so, Your Honor, the position of the state is that the 18 second clip that I'm attempting to play solely for impeachment, not to mark as an exhibit, not to put in substantively, is where Mr. Pryor adamantly denies that Davion Latson ever got out of the car. And so when he was confronted here in court it was his testimony that he remembered Davion coming at them. And then in the interview it was his statement that Davion never got out of the car.

-20-

THE COURT: Okay. [Defense Counsel], I understand your objection. * * * But, the testimony of * * * Lemonda Pryor was that he told Detective Stechschulte he, meaning Davion Latson, was coming at us. The 18 second clip that then the State played off the record for all of us -- * * * He's pretty adamant that Davion did not get out. He did not get out. He did not get out. He says it several times. So, I am going to overrule the objection and allow that to be played.

(Tr. at 674-682).

**{¶44}** Following the trial court's ruling, the trial resumed and the clip of Lemonda's interview was played for the jury.

**{¶45}** On appeal, Morris argues that the prosecutor did not provide a full and fair opportunity for Lemonda to admit or deny whether he told the detective in the interview that Davion never left his vehicle. Because of this, Morris argues that the trial court erred by permitting extrinsic evidence of a prior inconsistent statement.

**{¶46}** Under Evid.R. 613(B), extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

-21-

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

**{¶47}** When applying Evid.R. 613(B) to the case *sub judice*, we emphasize that it is not clear that Lemonda specifically denied telling the detective that Davion got out of the vehicle. The closest he came to denying the statement was when he said, "If I would have said it. I don't remember saying it like that. I remember telling him that he was coming at us." During the questioning, Lemonda repeatedly equivocated, indicating he did not remember what he told the detective. He also attempted to explain and clarify his earlier statement by indicating he "might have said he leaned out the car knowing that he was out of the car."

**{¶48}** We find that it is not clear that Lemonda denied making the statement such that extrinsic evidence was admissible under Evid.R. 613(B). *See* State v. Greene, 2024-Ohio-35, ¶ 51 (12th Dist.). Importantly, *Lemonda* was never directly confronted with his prior interview or a transcript of the interview for him to specifically deny making the statement; rather, *Detective Stechschulte* was confronted with Lemonda's prior interview. Where the State fails to lay a proper foundation for the introduction of impeachment evidence, that evidence is inadmissible. *State v. Shook*, 2014-Ohio-3987, ¶ 55 (3d Dist.) (holding that there was no basis to introduce a prior inconsistent statement where witness did not deny making statement); *State v. Sullens*, 2017-Ohio-4081, ¶ 16 (10th Dist.).

**{¶49}** However, even though the impeachment evidence was erroneously admitted, the error did not result in prejudice that affected the outcome of the proceedings. Because Morris objected to the purported "impeachment" evidence, we review the erroneous admission for harmless error. In order to find harmless error, we would have to determine that Morris was prejudiced by the introduction of the evidence. *State v. Morris*, 2014-Ohio-5052, ¶ 23.

**{¶50}** Here, Lemonda's story was an outlier, conflicting with all the other witnesses who testified, including Morris. The physical evidence also contradicted Lemonda's statement that Davion was out of the vehicle at the time of the shooting. Given all the testimony and physical evidence, the record demonstrates that any error had no effect on the verdict, thus the error would be harmless beyond a reasonable doubt.

**{¶51}** Nevertheless, the admission of extrinsic evidence for impeachment under Evid.R. 613(B) *requires* a limiting instruction to inform the jury that the prior statement is only to be considered for impeachment purposes. *State v. Harrison*, 2022-Ohio-4627, ¶ 28 (2d Dist.), *State v. Dyer*, 2017-Ohio-426, ¶ 57 (11th Dist.), citing *State v. Armstrong*, 2004-Ohio-5635, ¶ 109 (11th Dist.); *State v. Fields*, 2007-Ohio-5060, ¶ 17 (8th Dist.). Here, the state concedes that no limiting instruction was provided and that an instruction should have been given.

**{¶52}** However, no jury instruction related to Evid.R. 613(B) was requested by Morris, thus we review the matter for plain error. "Notice of plain error under

Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶53} The question then becomes whether the failure to give the limiting instruction affected the trial's outcome. Similar to the Second District Court of Appeals in *Harrison, supra,* we do not find that the error here affected Morris's substantial rights because there was significant evidence to support Morris's convictions. It is undisputed that Morris shot and killed Davion. The only question was whether Morris was acting in self-defense. The jury was instructed on self-defense and found Morris's claim not to be credible. The jury's determination was supported by the testimony of others and the evidence. Thus, we find no prejudicial error here. Accordingly, Morris's second assignment of error is overruled.

*Third Assignment of Error*

{¶54} In his third assignment of error, Morris argues that the Reagan Tokes Law is unconstitutional. However, in *State v. Hacker*, 2023-Ohio-2535, the Supreme Court of Ohio determined that the Reagan Tokes Law was constitutional, rejecting similar claims to those made by Morris. Based on the holding in *Hacker*, Morris's third assignment of error is overruled.

*Conclusion*

**{¶55}** Having found no error prejudicial to Morris in the particulars assigned and argued, the assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/jlm**

**\*\* Judge Gene A. Zmuda of the Sixth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**